## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIRE AND POLICE PENSION ASSOCIATION OF COLORADO, and M. CLAY RAGSDALE, IV on behalf of themselves and all others similarly situated, | Civil Action No. <u>08-cv-10586</u> |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| | **ECF CASE** |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, DAVID L. HERZOG, STEPHEN F. BOLLENBACH, PEI-YUAN CHIA, MARSHALL A. COHEN, MARTIN S. FELDSTEIN, ELLEN V. FUTTER, STEPHEN L. HAMMERMAN, RICHARD C. HOLBROOKE, FRED H. LANGHAMMER, GEORGE L. MILES, JR., MORRIS W. OFFIT, JAMES F. ORR III, VIRGINIA M. ROMETTY, MICHAEL H. SUTTON, S.W. TSE, ROBERT B. WILLUMSTAD, FRANK G. ZARB, A.G. EDWARDS & SONS, INC. ANZ SECURITIES, B.C. ZIEGLER & CO., BANC OF AMERICA SECURITIES LLC, BARCLAYS CAPITAL, BB&T CAPITAL MARKETS, JPMORGAN CHASE & CO., BLAYLOCK & CO., INC., BMO CAPITAL MARKETS, BOSC, INC., C.L. KING & ASSOCIATES, INC., CHARLES SCHWAB & CO., CITIGROUP GLOBAL MARKETS INC., CITY SECURITIES CORPORATION, CREDIT SUISSE SECURITIES (USA) LLC, CROWELL WEEDON & CO., D.A. DAVIDSON & CO., DAIWA SECURITIES AMERICA INC., DAIWA SECURITIES SMBC EUROPE LTD., DAVENPORT & COMPANY LLC, DEUTSCHE BANK SECURITIES INC., DOLEY | |

SECURITIES, DOWLING & PARTNERS SECURITIES, LLC, FERRIS, BAKER WATTS, INCORPORATED, FIDELITY CAPITAL MARKETS, FIXED INCOME SECURITIES, LP, FOX-PITT KELTON COCHRAN CARONIA WALLER (USA) LLC, GOLDMAN SACHS & CO., GREENWICH CAPITAL MARKETS, INC., GUZMAN & COMPANY, H&R BLOCK FINANCIAL ADVISORS, INC., HSBC SECURITIES (USA) INC., J.J.B. HILLIARD, W.L. LYONS, INC., J.P. MORGAN SECURITIES INC., JANNEY MONTGOMERY SCOTT LLC, JEFFERIES & COMPANY, INC., KEEFE, BRUYETTE & WOODS, INC., KEYBANC CAPITAL MARKETS INC., LOOP CAPITAL MARKETS, LLC, MAXIM GROUP, LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MESIROW FINANCIAL, INC., MITSUBISHI UFJ SECURITIES INTERNATIONAL PLC, MIZUHO SECURITIES USA INC., MORGAN KEEGAN & COMPANY, INC., MORGAN STANLEY & CO. INCORPORATED, MURIEL SIEBERT & CO., INC., NATIONAL AUSTRALIA CAPITAL MARKETS, LLC, OPPENHEIMER & CO., PERSHING LLC, PIPER JAFFRAY & CO., RAYMOND JAMES & ASSOCIATES, INC., RBC DAIN RAUSCHER, ROBERT W. BAIRD & CO., RYAN BECK & CO., SAMUEL A. RAMIREZ & CO., INC., SCOTIA CAPITAL (USA) INC., SG AMERICAS SECURITIES LLC, STIFEL, NICOLAUS & COMPANY, INCORPORATED, STONE & YOUNGBERG LLC, SUNTRUST CAPITAL MARKETS, INC., TD AMERITRADE, INC., THE WILLIAMS CAPITAL GROUP, L.P., TOUSSAINT CAPITAL PARTNERS, LLC, UBS SECURITIES LLC, UTENDAHL CAPITAL GROUP, LLC, UTENDAHL

CAPITAL PARTNERS, L.P., VINING-
SPARKS IBG, L.P., WACHOVIA
CAPITAL MARKETS LLC, WEDBUSH
MORGAN SECURITIES INC., WELLS
FARGO SECURITIES, LLC, WILLIAM
BLAIR & COMPANY, L.L.C., and
PRICEWATERHOUSECOOPERS LLP,
Defendants.

## CLASS ACTION COMPLAINT

Plaintiffs Fire and Police Pension Association of Colorado ("FPPAC") and M. Clay Ragsdale, IV (collectively, "Plaintiffs"), allege the following based on the investigation of counsel which included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by American International Group, Inc. ("AIG" or the "Company"), as well as other reports, advisories, press releases, and other public statements issued by or with respect to AIG. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Until an unprecedented federal government bailout of the Company in September this year, AIG stood as the world's largest insurer. A self-proclaimed pioneer in the field, the Company consistently touted its role as an industry leader in issuing a quasi-insurance product known as a super senior credit default swap ("CDS"). A CDS is a derivative instrument purchased by investors seeking to hedge exposure to default on increasingly complex debt instruments. Over the past several years, AIG sought to capitalize on the growing market for CDSs, assuring investors that the Company's expertise and careful management of its CDS portfolio ensured a virtually risk-free profit

center for the Company, even in the harshest of market conditions. Increased defaults on the complex debt instruments tied to the CDSs prompted AIG's CDS counterparties to question the Company's valuations. Unbeknownst to investors, many of these counterparties began demanding that the Company post billions in collateral under the terms of the CDSs. Although never truthfully disclosed to investors, escalating collateral calls and plunging CDS valuations began to threaten the Company's liquidity and financial position, prompting AIG to seek tens of billions in dollars from the investing public in an attempt to stave off the pending calamity brewing at the Company's financial products division that sold the CDSs.

2.      As it did so, AIG and the defendants in this action—including the professional gatekeepers who received hundreds of millions of dollars in fees for their role in garnering tens of billions of dollars from the investing public—failed in their obligation to ensure the accuracy of AIG's public filings. When the true extent of the Company's imperiled financial condition began to be revealed, the securities identified herein plunged in value. This action seeks to recover the losses investors suffered as a result.

3.      This is a class action alleging violations of Sections 11, 12, and 15 of the Securities Act of 1933, 15 U.S.C. § 77a et seq. (the "Securities Act") on behalf of all persons who purchased or otherwise acquired securities in or traceable to the registered public offerings identified below in paragraph 112. These offerings are referred to collectively herein as the "Offerings."

4.      As set forth herein, each of the Offerings was conducted pursuant to three shelf registration statements, as defined below, which were filed with the SEC on Form

S-3 and/or Form S-3MEF on (i) June 12, 2003 (as amended through subsequent post-effective amendments filed with the SEC), (ii) June 22, 2007 (as amended through subsequent post-effective amendments filed with the SEC), and/or (iii) May 12, 2008. Form S-3 is a so-called "shelf registration," which permits an issuer to register numerous different securities for later issuance in a single SEC filing.   Once this "shelf" is established, the issuer may later "take down" securities from the shelf by issuing them to the public pursuant to a later-filed Prospectus, Prospectus Supplement, and/or Pricing Supplement that refers investors to the underlying Form S-3.   These securities offering materials incorporate by reference numerous other public filings of the issuer, such as annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K, including those filed both prior to and after the filing of the shelf registration statement.

5.     On June 12, 2003, AIG filed a shelf registration statement with the SEC on Form S-3 which, as amended through all post-effective amendments, is referred to herein as the "June 12, 2003 Shelf Registration Statement."[1]   On June 22, 2007, AIG filed a shelf registration statement with the SEC on Form S-3 which, as amended through all post-effective amendments, is referred to herein as the "June 22, 2007 Shelf Registration Statement."[2]   On May 12, 2008, AIG filed a shelf registration statement on

---

[1] The June 12, 2003 Shelf Registration Statement was assigned Commission File No. 333-106040.  The June 12, 2003 Shelf Registration Statement was declared effective on December 9, 2004 and amended by Post-Effective Amendment No. 1, which was declared effective on July 24, 2006.

[2] The June 22, 2007 Shelf Registration Statement, which was assigned Commission File No. 333-143992, is an independent Registration Statement, but also constitutes Post-Effective Amendment No. 2 to the June 12, 2003 Shelf Registration Statement.

Form S-3MEF to register additional securities for an offering conducted pursuant to Rule 462(b) of the Securities Act, referred to herein as the "May 12, 2008 Shelf Registration Statement."[3]   The June 12, 2003 Shelf Registration Statement, June 22, 2007 Shelf Registration Statement, and May 12, 2008 Shelf Registration Statement are referred to collectively herein as the "Shelf Registration Statements."

6.      The June 12, 2003 Shelf Registration Statement and the June 22, 2007 Shelf Registration Statement each included a prospectus.  In addition, as to each of the Offerings, AIG issued a prospectus supplement or pricing supplement that became part of the respective Shelf Registration Statement pursuant to which that offering was conducted.  As to each of the Offerings, the applicable shelf registration statement and the relevant prospectus, prospectus supplement, and/or Pricing Supplement (including any documents incorporated by reference) are referred to collectively as the "Offering Materials."

7.      The Offering Materials associated with each of the Offerings contained untrue statements of material fact and material omissions.  Among other things, these Offering Materials failed to disclose AIG's massive liability and exposure to credit default swaps ("CDSs")—financial instruments used by investors to hedge risk exposure on collateralized debt obligations and other debt securities.  In addition, and among other things, the Offering Materials misstated the Company's financial condition, including its quarterly and annual earnings and other financial results, based on an overvaluation of the

---

[3]   The May 12, 2008 Shelf Registration Statement was assigned Commission File No. 333-150865.  As explained below, the May 12, 2008 Equity Unit Offering and May 12, 2008 Common Stock Offering offered securities previously registered under Commission File Nos. 333-143992 and 333-106040, in addition to those registered pursuant to the May 12, 2008 Registration Statement.

CDS portfolio; misrepresented the Company's liquidity and capital position by failing to disclose collateral calls from CDS counterparties or incorporate the impact of the collateral calls on AIG's financial position; misrepresented the adequacy and integrity of the Company's internal controls over financial reporting; and failed to disclose investigations into the Company's practices by regulatory authorities regarding AIG's accounting, valuation and disclosure of its CDS portfolio.

8.     Later revelations concerning the Company's true financial condition harmed investors by causing a significant decline in the value of the securities purchased in or traceable to the above-listed offerings.  Plaintiffs bring this action to recover these damages under the Securities Act.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

10.     This Court has jurisdiction pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. 77v, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this district.

12.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

## PARTIES

### Plaintiffs

13.     Plaintiff FPPAC is a retirement system under the laws of Colorado, established pursuant to Title 31, Article 31, Part 3 of the Colorado Revised Statutes, created to provide retirement benefits for fire station and police employees of the State of Colorado.  FPPAC has total assets of approximately $2.5 billion under investment for its beneficiaries and maintains its principal place of business in Arapahoe County, Colorado. As set forth in the attached certification, FPPAC purchased AIG securities at issue herein.

14.     Plaintiff M. Clay Ragsdale, IV ("Plaintiff Ragsdale") is the son of and attorney in fact for his parents, Milton C. Ragsdale and Jean R. Ragsdale (the "Ragsdales").  As attorney in fact for the Ragsdales, M. Clay Ragsdale, manages all the investments of and has full investment discretion and authority for the Ragsdales.  As set forth in the attached certification, Plaintiff Ragsdale purchased the securities at issue herein for the Ragsdales' accounts.

### AIG

15.     Defendant AIG is a Delaware corporation with its principal executive offices located at 70 Pine Street, New York, New York.  AIG, through its subsidiaries, describes itself as a world leader in insurance and financial services with operations in more than 130 countries.  AIG's common stock trades on the New York Stock Exchange under the ticker symbol "AIG."

### Individual Defendants

16.     Martin J. Sullivan was, at times relevant hereto, the Chief Executive Officer of AIG and a member of the Board of Directors.  Defendant Sullivan signed Shelf Registration Statements at issue herein.

17.     Steven J. Bensinger was, at times relevant hereto, an Executive Vice President and the Chief Financial Officer of AIG.  Defendant Bensinger signed Shelf Registration Statements at issue herein.

18.     David L. Herzog was, at times relevant hereto, the Senior Vice President and Comptroller and Principal Accounting Officer of AIG.  Defendant Herzog signed Shelf Registration Statements at issue herein.

19.     Stephen F. Bollenbach was, at times relevant hereto, a member of the Board of Directors.  Defendant Bollenbach signed a Shelf Registration Statement at issue herein.

20.     Pei-yuan Chia was, at times relevant hereto, a member of the Board of Directors.  Defendant Chia signed Shelf Registration Statements at issue herein.

21.     Marshall A. Cohen was, at times relevant here, a member of the Board of Directors.  Defendant Cohen signed Shelf Registration Statements at issue herein.

22.     Martin S. Feldstein was, at times relevant hereto, a member of the Board of Directors.  Defendant Feldstein signed Shelf Registration Statements at issue herein.

23.     Ellen V. Futter was, at times relevant hereto, a member of the Board of Directors.  Defendant Futter signed Shelf Registration Statements at issue herein.

24.     Stephen L. Hammerman was, at times relevant hereto, a member of the Board of Directors.   Defendant Hammerman signed Shelf Registration Statements at issue herein.

25.     Richard C. Holbrooke was, at times relevant hereto, a member of the Board of Directors.  Defendant Holbrooke signed Shelf Registration Statements at issue herein.

26.     Fred H. Langhammer was, at times relevant hereto, a member of the Board of Directors.   Defendant Langhammer signed Shelf Registration Statements at issue herein.

27.     George L. Miles, Jr. was, at times relevant hereto, a member of the Board of Directors.  Defendant Miles signed Shelf Registration Statements at issue herein.

28.     Morris W. Offit was, at times relevant hereto, a member of the Board of Directors.  Defendant Offit signed Shelf Registration Statements at issue herein.

29.     James F. Orr III was, at times relevant hereto, a member of the Board of Directors.  Defendant Orr signed Shelf Registration Statements at issue herein.

30.     Virgina M. Rometty was, at times relevant hereto, a member of the Board of Directors.  Defendant Rometty signed Shelf Registration Statements at issue herein.

31.     Michael H. Sutton was, at times relevant hereto, a member of the Board of Directors.  Defendant Sutton signed Shelf Registration Statements at issue herein.

32.     Edmund S.W. Tse was, at times relevant hereto, a member of the Board of Directors.  Defendant Tse signed Shelf Registration Statements at issue herein.

33.     Robert B. Willumstad was, at times relevant hereto, a member of the Board of Directors.  Defendant Willumstad signed Shelf Registration Statements at issue herein.

34.     Frank G. Zarb was, at times relevant hereto, a member of the Board of Directors.  Defendant Zarb signed Shelf Registration Statements at issue herein.

35.     The defendants named in paragraphs 16-34 are referred to collectively herein as the "Individual Defendants."

**Underwriter Defendants**

36.     AG Edwards & Sons, Inc. ("AG Edwards") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, AG Edwards was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

37.     ANZ Securities ("ANZ") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, ANZ was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

38.     B.C. Ziegler and Company ("B.C. Zeigler") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, B.C. Zeigler was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

39.     Banc of America Securities LLC ("BoA") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, BoA was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

40.     Barclays Capital ("Barclays") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Barclays was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

41.     BB&T Capital Markets, a division of Scott & Stringfellow, Inc. ("BB&T"), was an underwriter of Offerings as specified herein.  As an underwriter of

Offerings, BB&T was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

42.     Defendant JPMorgan Chase & Co. is a successor in liability to Bear Stearns & Co Inc. ("Bear Stearns").    Bear Stearns was an underwriter of Offerings as specified herein.   As an underwriter of Offerings, Bear Stearns was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

43.     Blaylock & Company, Inc. ("Blaylock") was an underwriter of Offerings as specified herein.   As an underwriter of Offerings, Blaylock was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

44.     BMO Capital Markets ("BMO") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, BMO was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

45.     BOSC, Inc. ("BSOC") was an underwriter of Offerings as specified herein.   As an underwriter of Offerings, BSOC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

46.     C.L. King & Associates, Inc. ("C.L. King") was an underwriter of Offerings as specified herein.   As an underwriter of Offerings, C. L. King was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

47.     Charles Schwab & Co., Inc. ("Charles Schwab") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, Charles Schwab was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

48.     Citigroup Global Markets Inc. ("Citigroup") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, Citigroup was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

49.     City Securities Corporation ("City") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, City was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

50.     Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, Credit Suisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

51.     Crowell Weedon & Co ("Crowell") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, Crowell was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

52.     D.A. Davidson & Co. ("D.A. Davison") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, D.A. Davidson was responsible for

ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

53.     Daiwa Securities America Inc. ("Daiwa America") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Daiwa America was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

54.     Daiwa Securities SMBC Europe Ltd ("Daiwa Europe") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Daiwa Europe was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

55.     Davenport & Company LLC ("Davenport") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Davenport was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

56.     Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Deutsche Bank was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

57.     Doley Securities ("Doley") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Doley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

58.     Dowling & Partners Securities, LLC ("Dowling") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Dowling was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

59.     Ferris, Baker Watts, Incorporated ("Ferris") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Ferris was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

60.     Fidelity Capital Markets, a division of National Financial Services LLC ("Fidelity"), was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Fidelity was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

61.     Fixed Income Securities, LP ("Fixed Income") was  an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Fixed Income was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

62.     Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC ("Fox-Pitt") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Fox-Pitt was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

63.     Goldman Sachs & Co ("Goldman") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Goldman was responsible for ensuring

the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

64.     Greenwich Capital Markets, Inc. ("Greenwich") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Greenwich was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

65.     Guzman & Company ("Guzman") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Guzman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

66.     H&R Block Financial Advisors, Inc ("H&R Block") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, H&R Block was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

67.     HSBC Securities (USA) Inc. ("HSBC") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, HSBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

68.     J.J.B. Hilliard, W.L. Lyons, Inc. ("J.J.B. Hilliard") was an underwriter of Offerings as specified herein.   As an underwriter of Offerings, J.J.B. Hilliard was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

69.     J.P. Morgan Securities Inc. ("JPMSI") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, JPMSI was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

70.     Janney Montgomery Scott LLC ("Janney") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Janney was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

71.     Jefferies & Company, Inc. ("Jefferies") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Jeffries was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

72.     Keefe, Bruyette & Woods, Inc. ("Keefe Bruyette") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Keefe Bruyette was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

73.     KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, KeyBanc was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

74.     Loop Capital Markets, LLC ("Loop") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Loop was responsible for ensuring the

truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

75.     Maxim Group, LLC ("Maxim") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Maxim was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

76.     Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Merrill was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

77.     Mesirow Financial, Inc. ("Mesirow") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Mesirow was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

78.     Mitsubishi UFJ Securities International plc ("Mitsubishi") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Mistubishi was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

79.     Mizuho Securities USA Inc ("Mizuho") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Mizuho was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

80.     Morgan Keegan & Company, Inc. ("Morgan Keegan") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Morgan Keegan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

81.     Morgan Stanley & Co. Incorporated ("Morgan Stanley") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Morgan Stanley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

82.     Muriel Siebert & Co., Inc. ("Muriel") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Muriel was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

83.     National Australia Capital Markets, LLC ("NAB Capital") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, NAB Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

84.     Oppenheimer & Co. ("Oppenheimer") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Oppenheimer was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

85.     Pershing LLC ("Pershing") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Pershing was responsible for ensuring the

truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

86.     Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, Piper Jaffray was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

87.     Raymond James & Associates, Inc. ("Raymond James") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, Raymond James was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

88.     RBC Dain Rauscher ("RBC Dain") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, RBC Dain was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

89.     Robert W. Baird & Co. Incorporated ("Robert W. Baird") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, Baird was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

90.     Ryan Beck & Co ("Ryan Beck") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, Ryan Beck was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

91.     Samuel A. Ramirez & Co., Inc. ("Samuel A. Ramirez") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Samuel A. Ramirez was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

92.     Scotia Capital (USA) Inc. ("Scotia") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Scotia was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

93.     SG Americas Securities LLC ("SG Americas") was an underwriter of Offerings as specified herein.   As an underwriter of Offerings, SG Americas was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

94.     Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus") was an underwriter of Offerings as specified herein.   As an underwriter of Offerings, Stifel Nicolaus was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

95.     Stone & Youngberg LLC ("Stone") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Stone was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

96.     SunTrust Capital Markets, Inc. ("SunTrust") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, SunTrust was responsible

for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

97.    TD Ameritrade, Inc. ("TD Ameritrade") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, TD Ameritrade was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

98.    The Williams Capital Group, L.P. ("Williams") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Williams was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

99.    Toussaint Capital Partners, LLC ("Toussaint") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Toussaint was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

100.    UBS Securities LLC ("UBS") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, UBS was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

101.    Utendahl Capital Group, LLC ("Utendahl Group") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Utendahl Group was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

102.    Utendahl Capital Partners, L.P. ("Utendahl Partners") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Utendahl Partners was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

103.    Vining-Sparks IBG, Limited Partnership ("Vining-Sparks") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Vining-Sparks was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

104.    Wachovia Capital Markets LLC ("Wachovia") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Wachovia was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

105.    Wedbush Morgan Securities Inc ("Wedbush") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, Wedbush was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

106.    Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of Offerings as specified herein.   As an underwriter of Offerings, Wells Fargo was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

107.    William Blair & Company, L.L.C. ("William Blair") was an underwriter of Offerings as specified herein.  As an underwriter of Offerings, William Blair was

responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

108.    The defendants named in paragraphs 36-107 are referred to collectively herein as the "Underwriter Defendants."

**Auditor Defendant**

109.    Defendant PricewaterhouseCoopers LLP ("PWC"), at all relevant times, served as an Independent Registered Public Accounting Firm for AIG.  PWC audited AIG's financial statements for the year ended December 31, 2006, which financial statements were approved by PWC and included in AIG's annual report for 2006, which was filed on Form 10-K with the SEC and incorporated by reference into each of the Offerings that occurred after March 1, 2007 (the date it was filed).  PWC also audited AIG's financial statements for the year ended December 31, 2007, which financial statements were approved by PWC and included in AIG's annual report for 2007, which was filed on Form 10-K with the SEC and incorporated by reference into each of the Offerings that occurred after February 28, 2008 (the date it was filed).  PWC consented to the incorporation by reference of its reports of these annual reports on Form 10-K and to the incorporation by reference of its reports in the Shelf Registration Statements at issue herein.

## CLASS ACTION ALLEGATIONS

110.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired AIG securities pursuant or traceable to the Offerings as specified in paragraph 112, and who

were damaged thereby (the "Class").  Excluded from the Class are: (i) Defendants; (ii) officers and directors of AIG and its subsidiaries and affiliates; (iii) members of the family of each Individual Defendant; (iv) any entity in which any defendant has or has had a controlling interest; and (v) the legal representatives, heirs, successors and assigns of any such excluded party.

111.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff as this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members of the Class located throughout the United States because throughout the Class Period, the AIG securities identified herein actively traded on national exchanges, including the New York Stock Exchange ("NYSE") on which AIG common stock traded under the symbol "AIG."  The names and addresses of the record owners of AIG securities, purchased or acquired, are available from the Company and/or its transfer agents and from the Underwriter Defendants.  Notice may be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

112.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and other members of the Class purchased or acquired their AIG securities pursuant or traceable to the Offering Materials and sustained damages as a result of Defendants' wrongful conduct complained of herein.  Plaintiffs are committed to prosecuting this action and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have the same interests as the other class members.

Accordingly, Plaintiffs are adequate Class representatives and will fairly and adequately protect the interests of the Class.

113.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members individually to seek redress for the wrongful conduct alleged herein.

114.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether the Shelf Registration Statements issued by AIG contained untrue statements of material facts or omitted to state material information;

(c)    whether the Offering Materials issued by AIG contained untrue statements of material facts or omitted to state material information; and

(d)    whether the members of the Class have sustained damages, and if so, what is the proper measure of those damages.

115.    Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

116.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants,

or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

117.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### A.    SUMMARY OF AIG'S SECURITY OFFERINGS

118.    The Securities Act claims are brought on behalf of investors who purchased AIG securities on or traceable to the following Offerings:

### OFFERINGS PURSUANT TO THE
### JUNE 12, 2003 SHELF REGISTRATION STATEMENT

| DATE | SECURITY (CUSIP) | VOLUME |
|---|---|---|
| March 6, 2007 (the "March 6, 2007 Offering") | American International Group, Inc. 6.25% Series A-1 Junior Subordinated Debentures Due 3/15/2037 <br><br> (026874BE6) | $1 billion |
| March 13, 2007 (the "March 13, 2007 4.95% Offering") | American International Group, Inc. Medium-Term Notes Series MP 4.95% Due 3/20/2012 <br><br> (02687QBL1) | $600 million |
| March 13, 2007 (the "March 13, 2007 Floating Rate Offering") | American International Group, Inc. Medium-Term Notes Series MP Floating Rate Due 3/20/2012 (02687QBK3) | $300 million |
| May 15, 2007 (the "May | American International Group, Inc. Medium-Term Notes Series MP | $850 million[4] |

| | | |
|---|---|---|
| 15, 2007 Offering") | 5.45% Due 5/18/2017<br><br>(02687QBW7) | |
| May 25, 2007 (the "May 25, 2007 Offering") | American International Group, Inc. Medium-Term Notes Series MP 5.45% Due 5/18/2017<br><br>(02687QBW7) | $200 million[4] |
| May 31, 2007 (the "May 31, 2007 Offering") | American International Group, Inc. 6.45% Series A-4 Junior Subordinated Debentures Due 6/15/2077<br><br>(026874800) | $750 million |

## OFFERINGS PURSUANT TO THE
## JUNE 22, 2007 SHELF REGISTRATION STATEMENT

| DATE | SECURITY (CUSIP) | VOLUME |
|---|---|---|
| October 4, 2007 (the "October 4, 2007 Offering") | American International Group, Inc. Medium-Term Notes Series MP 5.45% Due 5/18/20179<br><br>(02687QBW7) | $200 million[4] |
| December 7, 2007 (the "December 7, 2007 Offering") | American International Group, Inc. Medium-Term Notes Series G 5.85% Due 1/16/2018<br><br>(02687QDG0) | $2.5 billion |
| December 11, 2007 (the "December 11, 2007 Offering") | American International Group, Inc. 7.7% Series A-5 Junior Subordinated Debentures Due 12/18/2062<br><br>(026874859) | $1 billion |

---

[4] Notes issued in the May 25, 2007 Offering constituted a further issuance of, and were consolidated with, the principal amount previously issued in the May 12, 2007 Offering; notes issued in the October 4, 2008 Offering constituted a further issuance of, and were further consolidated with those issued in the May 12, 2007 Offering and May 25, 2007 Offering; notes issued in each Offering were assigned the same CUSIP number.

## OFFERING PURSUANT TO THE
## MAY 12, 2008 SHELF REGISTRATION STATEMENT

| DATE | SECURITY (CUSIP) | VOLUME |
|---|---|---|
| May 12, 2008 (the "May 12, 2008 Equity Unit Offering") | American International Group, Inc. 72,000,000 Equity Units; Series B-1 Junior Subordinated Debentures Due 2/15/2041; Series B-2 Junior Subordinated Debentures Due 5/1/2041; Series B-3 Junior Subordinated Debentures Due 8/1/2041 (026874115) | $5.4 billion[5] |
| May 12, 2008 (the "May 12, 2008 Common Stock Offering") | American International Group, Inc. 171,052,631 Shares of Common Stock (026874107) | $7.475 billion |

**B.**    **THE OFFERING MATERIALS CONTAINED UNTRUE STATEMENTS**

119.    Each of these Offerings was conducted pursuant to one or more of the Shelf Registration Statements.  When the Shelf Registration Statements became effective as to each of the Offerings, the prospectus, prospectus supplement or pricing supplement issued in connection with such Offering became a part of that Shelf Registration Statement pursuant to which the Offering was conducted.  These Offering Materials incorporated by reference documents containing untrue statements of material fact and material omissions.  Accordingly, as to each Offering, the Offering Materials contained untrue statements and omissions of material fact in violation of the Securities Act.

---

[5] As noted, the May 12, 2008 Equity Unit Offering and May 12, 2008 Common Stock Offering offered securities previously registered pursuant to earlier effective registration statements under Commission File Nos. 333-143992 and 333-106040, in addition to those registered pursuant to Rule 462(b) of the Securities Act in the May 12, 2008 Shelf Registration Statement.

120.    Defendants herein are liable for violations of the Securities Act arising out of the sale of AIG securities pursuant to the Offering Materials issued in connection with the Offerings.   None of the Defendants conducted a reasonable investigation of the statements made in the Offering Materials or the documents incorporated therein, and did not possess reasonable grounds for believing that the statements in the Offering Materials and the documents incorporated therein were true.

121.    AIG Financial Products ("AIGFP"), a subsidiary of AIG, issues credit protection through credit default swaps on select senior collateralized debt obligations ("CDOs").[6]   These CDSs are used by investors to hedge risk exposure on CDOs and other debt securities.   CDSs are derivative instruments in which one party agrees, for a periodic fee, to assume the risk of non-payment on an underlying asset.   In the event of a default on the underlying asset, the seller of the CDS is obligated to compensate the purchaser of the credit protection for the defaulted amounts.

122.    The value of a CDS is derived from the quality of the underlying asset, and its price is determined by the expected likelihood of default and the probable amount of the loss, or "loss severity."   The "value" of the swap is therefore the amount of payments due to the seller over the life of the swap, less the likely default payments the seller will owe the purchaser.   As the amount of the default payments increases, the value of the swap decreases.   By 2007, AIG's CDSs covered debt instruments with a face value of over $500 billion.

---

[6]   CDOs are financial instruments that bundle various asset-backed and/or mortgage-backed securities ("ABSs" and "MBSs," respectively) and repackage the income streams from these securities into various "tranches" that correspond to the level of credit risk associated with the underlying assets and/or mortgages.

123.   The Offering materials contained untrue statements of material fact and material omissions because, among other things, they:

- Failed to disclose AIG's massive exposure to and liability resulting from its CDS portfolio;

- Misstated the Company's financial condition, including earnings and other financial results, based on an inflated valuation of the CDS portfolio;

- Failed to disclose that the Company did not have the proper controls or procedures to properly value the CDS portfolio, or that the numerous tests and analyzes purportedly performed by the Company as reported in AIG's financial statements did not legitimately or reasonably measure the exposure resulting from the CDS portfolio on the Company's financial position;

- Misstated the Company's liquidity and capital position by failing to fully disclose the nature, frequency and significance of CDS counterparty collateral calls, the identity of those counterparties, or properly incorporate or disclose the impact of the collateral calls on AIG's financial position and liquidity;

- Misstated the adequacy and integrity of the Company's internal controls over accounting for or valuation of the CDS portfolio or disclose that proper internal controls over the Company's financial reporting were lacking; and

- Failed to disclose regulatory inquiries into AIG's accounting, valuation and disclosure of its CDS portfolio.

124.    These undisclosed facts directly impacted the various SEC filings incorporated into the Offering Materials identified below, including the Company's financial statements, rendering the Offering Materials untrue.

125.    With respect to each Offering, for purposes of liability under the Securities Act, the "effective date" of each of the Shelf Registration Statements is the date of the relevant Offering, not the earlier date on which the Shelf Registration Statement itself was filed. *See* 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

126.    The Shelf Registration Statements expressly incorporate by reference AIG's Forms 10-K, 10-Q, and 8-K that were filed with the SEC prior to the date of each of the Offerings conducted pursuant to the Shelf Registration Statements.  Specifically, each of the Shelf Registration Statements contain the following or materially similar language:

> The SEC allows us to "incorporate by reference" the information AIG files with the SEC, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference in this prospectus is considered to be part of this prospectus, and later information that AIG files with the SEC will automatically update and supersede that information as well as the information included in this prospectus. AIG incorporates by reference the documents below, any filings that we make after the date of the initial filing of this registration statement and prior to the effectiveness of that registration statement and any future filings made with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 until all the securities are sold. This prospectus is part of a registration statement AIG filed with the SEC.

127.    Accordingly, on the date of each of the Offerings set forth above, the Shelf Registration Statements incorporated by reference each of the documents containing untrue statements of material fact filed pursuant to Forms 10-K, 10-Q or 8-K that had been filed prior to the date of each respective Offering.  As to each such Offering, the

documents containing untrue statements of material fact and material omissions that were incorporated in the Shelf Registration Statements, rendering the Offering Materials untrue as of the date of that Offering are as follows:

| OFFERING | DOCUMENTS INCORPORATED INTO THE OFFERING MATERIALS CONTAINING UNTRUE STATEMENTS OF MATERIAL |
|---|---|
| March 6, 2007 Offering | November 9, 2006 Form 8-K<br>November 9, 2006 Form 10-Q<br>March 1, 2007 Form 8-K<br>March 1, 2007 Form 10-K |
| March 13, 2007 4.95% Offering | November 9, 2006 Form 8-K<br>November 9, 2006 Form 10-Q<br>March 1, 2007 Form 8-K<br>March 1, 2007 Form 10-K |
| March 13, 2007 Floating Rate Offering | November 9, 2006 Form 8-K<br>November 9, 2006 Form 10-Q<br>March 1, 2007 Form 8-K<br>March 1, 2007 Form 10-K |
| May 15, 2007 Offering | November 9, 2006 Form 8-K<br>November 9, 2006 Form 10-Q<br>March 1, 2007 Form 8-K<br>March 1, 2007 Form 10-K<br>May 10, 2007 Form 8-K<br>May 10, 2007 Form 10-Q |
| May 25, 2007 Offering | November 9, 2006 Form 8-K<br>November 9, 2006 Form 10-Q<br>March 1, 2007 Form 8-K<br>March 1, 2007 Form 10-K<br>May 10, 2007 Form 8-K<br>May 10, 2007 Form 10-Q |
| May 31, 2007 Offering | November 9, 2006 Form 8-K<br>November 9, 2006 Form 10-Q<br>March 1, 2007 Form 8-K<br>March 1, 2007 Form 10-K<br>May 10, 2007 Form 8-K<br>May 10, 2007 Form 10-Q |
| October 4, 2007 Offering | November 9, 2006 Form 8-K<br>November 9, 2006 Form 10-Q<br>March 1, 2007 Form 8-K<br>March 1, 2007 Form 10-K |

| | |
|---|---|
| | May 10, 2007 Form 8-K |
| | May 10, 2007 Form 10-Q |
| | August 8, 2007 Form 8-K |
| | August 8, 2007 Form 10-Q |
| December 7, 2007 Offering | November 9, 2006 Form 8-K |
| | November 9, 2006 Form 10-Q |
| | March 1, 2007 Form 8-K |
| | March 1, 2007 Form 10-K |
| | May 10, 2007 Form 8-K |
| | May 10, 2007 Form 10-Q |
| | August 8, 2007 Form 8-K |
| | August 8, 2007 Form 10-Q |
| | November 7, 2007 Form 8-K |
| | November 7, 2007 Form 10-Q |
| December 11, 2007 Offering | November 9, 2006 Form 8-K |
| | November 9, 2006 Form 10-Q |
| | March 1, 2007 Form 8-K |
| | March 1, 2007 Form 10-K |
| | May 10, 2007 Form 8-K |
| | May 10, 2007 Form 10-Q |
| | August 8, 2007 Form 8-K |
| | August 8, 2007 Form 10-Q |
| | November 7, 2007 Form 8-K |
| | November 7, 2007 Form 10-Q |
| | December 7, 2007 Form 8-K |

| May 12, 2008 Equity Unit Offering | November 9, 2006 Form 8-K<br>November 9, 2006 Form 10-Q<br>March 1, 2007 Form 8-K<br>March 1, 2007 Form 10-K<br>May 10, 2007 Form 8-K<br>May 10, 2007 Form 10-Q<br>August 8, 2007 Form 8-K<br>August 8, 2007 Form 10-Q<br>November 7, 2007 Form 8-K<br>November 7, 2007 Form 10-Q<br>December 7, 2007 Form 8-K<br>February 11, 2008 Form 8-K<br>February 28, 2008 Form 8-K<br>February 28, 2008 Form 10-K<br>May 8, 2008 Form 8-K<br>May 8, 2008 Form 10-Q |
|---|---|
| May 12, 2008 Common Stock Offering | November 9, 2006 Form 8-K<br>November 9, 2006 Form 10-Q<br>March 1, 2007 Form 8-K<br>March 1, 2007 Form 10-K<br>May 10, 2007 Form 8-K<br>May 10, 2007 Form 10-Q<br>August 8, 2007 Form 8-K<br>August 8, 2007 Form 10-Q<br>November 7, 2007 Form 8-K<br>November 7, 2007 Form 10-Q<br>December 7, 2007 Form 8-K<br>February 11, 2008 Form 8-K<br>February 28, 2008 Form 8-K<br>February 28, 2008 Form 10-K<br>May 8, 2008 Form 8-K<br>May 8, 2008 Form 10-Q |

128.   As explained in further detail below, the documents filed with the SEC and incorporated in the Offering Materials as detailed above contained untrue statements of material fact and material omissions in violation of the Securities Act.

C.    **AIG'S FINANCIAL RESULTS FOR THE THIRD QUARTER 2006 CONTAIN UNTRUE STATEMENTS**

129.    On November 9, 2006, AIG announced its financial results for the third quarter of 2006 and filed its Form 10-Q with the SEC (the "2006 Third Quarter Form 10-Q"). The press release was filed with the SEC on November 13, 2006 as an exhibit to Form 8-K.

130.    As reported in the 2006 Third Quarter Form 10-Q, operating income in the Company's Capital Markets division – the department of AIGFP that developed and issued the subsidiary's portfolio of CDSs – increased by $1.12 billion compared to the same three-month period in 2005. Moreover, Capital Markets reported an operating income of $965 million in the Third Quarter 2006 – an *almost $2 billion improvement* from the $952 million operating loss reported in Capital Markets in the second quarter of 2006. Further, Capital Markets reported $1.18 billion in revenues in the Third Quarter, an almost $2 billion jump from the $788 million Second Quarter loss in the Capital Markets division.

131.    These results had a direct and material impact on the Company's reported earnings. In the Third Quarter 2006, AIG reported net income of $4.22 billion, or $1.61 per diluted share, compared to the $3.19 billion, or $1.21 per diluted share that was reported in the Company's 2006 in the Second Quarter, and profits were more than double what the Company reported in the third quarter a year earlier.

132.    Defendants Sullivan and Bensinger certified the results reported in the 2006 Third Quarter Form 10-Q, certifying, *inter alia*, that (1) the report was free from untrue statements of material facts or material omissions and (2) that each had "[d]esigned such internal control over financial reporting, or caused such internal control

over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

133.   The Company's November 9, 2006 press release stated:

Net income for the first nine months of 2006 was $10.61 billion or $4.04 per diluted share, compared to $10.03 billion or $3.82 per diluted share in the first nine months of 2005. Adjusted net income for the first nine months of 2006 was $11.55 billion or $4.40 per diluted share, compared to $8.37 billion or $3.19 per diluted share in the first nine months of 2005.

134.   The Company's 2006 Third Quarter Form 10-Q, as well as the certifications of Defendants Sullivan and Bensinger attesting to the reliability of the Company's financial statements and the Company's November 9, 2006 press release contained untrue statements of material fact and/or omitted material facts because the Company did not accurately value the liabilities in its credit derivatives portfolio, nor were the necessary controls in place to enable the Company to do so.  The Company's failure to properly account for these liabilities rendered AIG's financial statements untrue.  In particular, AIG failed to disclose the nature or extent of the disagreements that AIG had with CDS counterparties which had disputed the Company's CDS valuations, nor did AIG reveal the identities of its counterparties or the fact that the firms disputing AIG's valuations were highly regarded as experts in CDS modeling.  The Company's failure to disclose the significant risk posed by counterparty capital postings or assess the impact of such collateral calls on its financial condition rendered statements regarding the Company's financial condition materially untrue.

**D.    AIG's FOURTH QUARTER 2006 FINANCIAL RESULTS CONTAIN UNTRUE STATEMENTS**

135.    On March 1, 2007, AIG issued its Form 10-K for 2006 ("2006 Form 10-K") and issued a press release announcing its financial results for the fourth quarter ended December 31, 2006.  The March 1, 2007 press release was filed with the SEC as an Exhibit to Form 8-K on March 1, 2007.

136.    In the March 1, 2007 press release, AIG:

reported net income for the full year 2006 of $14.05 billion or $5.36 per diluted share, compared to $10.48 billion or $3.99 per diluted share for the full year 2005. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. Full year 2006 adjusted net income, as defined below, was $15.41 billion or $5.88 per diluted share, compared to $8.75 billion or $3.33 per diluted share for the full year of 2005.

Net income for the fourth quarter of 2006 was $3.44 billion or $1.31 per diluted share compared to $444 million or $0.17 per diluted share for the fourth quarter of 2005. Fourth quarter 2006 adjusted net income was $3.85 billion or $1.47 per diluted share, compared to $376 million or $0.14 per diluted share for the fourth quarter of 2005.

* * *

Fourth quarter 2006 Financial Services operating income before the effect of economically effective hedge activities that did not qualify for hedge accounting treatment under FAS 133 was $638 million, an increase of 22.9 percent compared to the fourth quarter of 2005.

* * *

Capital Markets operating income in the fourth quarter of 2006 increased significantly as results were, in part, driven by increased transaction flow for structured credit products, coupled with favorable demand generally across the full range of its product areas. Fourth quarter 2006 results benefited from the realization of gains on a number of transactions originated in prior years that matured or were sold in the quarter. Fourth quarter 2005 results were adversely affected by the reduction of Capital Markets' investor-based structured notes business due to AIG's inability to fully access the capital markets during 2005.

137.   In the March 1, 2007 press release CEO Sullivan was quoted as saying, "Financial Services results were led by robust transaction flow from the Capital Markets operations."

138.   The 2006 Form 10-K repeated the financial figures from the March 1, 2007 press release.

139.   Additionally, according to the 2006 Form 10-K, AIG performed the required market value assessment on its derivative instruments under the following stated policy:

> *Fair Value Determinations of Certain Assets And Liabilities (Financial Services):*
>
> •     Valuation models: utilizing factors, such as market liquidity and current interest, foreign exchange and volatility rates.
>
> •     Market price data: AIG attempts to secure reliable and independent current market price data, such as published exchange rates from external subscription services such as Bloomberg or Reuters or third-party broker quotes for use in its models. When such data is not available, AIG uses an internal methodology, which includes interpolation and extrapolation from verifiable recent prices.

140.   As explained in the 2006 Form 10-K, the descriptive "super senior" label was meant to reflect the fact that AIG's CDS product was designed to insure only the most highly-rated portion of securities that had many differing risk levels, and that in all cases the insured portion was "senior" to even a AAA-rated tranche:

> In certain cases, the credit risk associated with a designated portfolio is tranched into different layers of risk, which are then analyzed and rated by the credit rating agencies. Typically, there will be an equity layer covering the first credit losses in respect of the portfolio up to a specified percentage of the total portfolio, and then successive layers that are rated, generally a BBB-rated layer, an A-rated layer, an AA-rated layer, and one or more AAA-rated layers. In transactions that are rated, the risk layer or tranche that is immediately junior to the threshold level above which AIGFP's payment obligation would generally arise is rated AAA by the rating agencies. In transactions that are not rated, AIGFP applies the same

risk criteria for setting the threshold level for its payment obligations. *Therefore, the risk layer assumed by AIGFP with respect to the designated portfolio in these transactions is often called the "super senior" risk layer, defined as the layer of credit risk senior to a risk layer that has been rated AAA by the credit rating agencies, or if the transaction is not rated, equivalent thereto.* (Emphasis added).

141.     Thus, the "super senior" nature of the CDS product conveyed a strong message to investors regarding the security of this product, and corresponding profitability to the insurer.

142.     According to the 2006 Form 10-K, the Company continually monitors its CDS portfolio to assess whether credit defaults on the underlying reference entities altered AIGFP's risk exposure:

> AIGFP continually monitors the underlying portfolios to determine whether the credit loss experience for any particular portfolio has caused the likelihood of AIGFP having a payment obligation under the transaction to be greater than super senior risk. AIGFP *maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss and has hedged outstanding transactions in this manner on occasion*. At December 31, 2006, the notional amount with respect to the Capital Markets credit derivative portfolio (including the super senior transactions) was $483.6 billion. (Emphasis added).

143.     Moreover, AIG assured investors that, because of how the CDSs were structured, the possibility that AIG would actually be forced to make a payment on any of these instruments was virtually non-existent, even in the most adverse market conditions. For example, in the 2006 Form 10-K the Company represented:

> AIGFP provides such credit protection on a "second loss" basis, under which AIGFP's payment obligations arise only after credit losses in the designated portfolio exceed a specified threshold amount or level of "first losses." *The threshold amount of credit losses that must be realized before AIGFP has any payment obligation is negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios.* (Emphasis added).

144.   Both Sullivan and Bensinger certified the results reported in the 2006 Form 10-K, representing, *inter alia*, (1) that the report was free from untrue statements of material facts or material omissions; (2) that Sullivan and Bensinger designed disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;  (3) that Sullivan and Bensinger designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and (4) that Sullivan and Bensinger evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in the 2006 Form 10-K.

145.   The Company's March 1, 2007 press release, its 2006 Form 10-K, as well as the certifications of Defendants Sullivan and Bensinger contained untrue statements of material fact and/or omitted material facts because the Company did not accurately value the liabilities in its credit derivatives portfolio, nor were the necessary controls in place to enable the Company to do so.  The Company's failure to properly account for these liabilities rendered AIG's financial statements untrue.  In particular, AIG failed to disclose that it had written billions in liquidity puts on CDOs linked to risky assets. These put agreements required AIGFP to purchase certain CDOs at par, giving the put holder the option to exercise at the time a default on the underlying collateral was

imminent or at least likely. AIG would then have to take back the underlying assets in exchange for only the CDS price it had received when the credit quality of the assets was considered much higher. The failure to disclose the significant exposure from these instruments caused the Company's financial condition to be materially misstated.

146.    Furthermore, the financial results as reported by AIG were untrue because the Company failed to properly value or incorporate its exposure to its CDS portfolio, including the risks presented to the Company's liquidity and financial position. AIG failed to disclose the nature or extent of the disagreements AIG had with CDS counterparties that disputed the Company's CDS valuations, nor did AIG reveal the identities of its counterparties or the fact that the firms disputing AIG's valuations were highly regarded as experts in CDS modeling. The Company's failure to disclose the significant risk posed by these collateral calls and to reasonably assess the impact of such collateral calls on the Company's liquidity and capital needs rendered its financial results materially untrue.

## E.    AIG'S FIRST QUARTER 2007 FINANCIAL RESULTS CONTAIN UNTRUE STATEMENTS

147.    On May 10, 2007, AIG announced its financial results for the first quarter of 2007 and filed its Form 10-Q with the SEC (the "2007 First Quarter Form 10-Q").

148.    The Company's financial results were reported in a press release filed with the SEC as an exhibit to Form 8-K on May 10, 2007 (the "May 10, 2007 Form 8-K"). In the press release, the Company stated:

> net income for the first quarter of 2007 was $4.13 billion or $1.58 per diluted share, compared to $3.20 billion or $1.22 per diluted share in the first quarter of 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133 or for which hedge accounting was not applied, including the related foreign exchange gains and losses. First

quarter 2007 adjusted net income, as defined below, was $4.39 billion or $1.68 per diluted share, compared to $3.38 billion or $1.29 per diluted share for the first quarter of 2006.

149.     The press release also included the following comments from Sullivan:

"In Financial Services, aircraft lease rates remained strong as did demand for ILFC's modern fuel-efficient fleet. AIG Financial Products experienced slower transaction flow compared to a strong first quarter of 2006. While the slowdown in the U.S. residential real estate market affected American General Finance's results, *prior action taken to limit certain geographic and product exposures has helped AGF avoid some of the significant credit deterioration currently facing the real estate lending industry*." (emphasis added).

150.     The 2007 First Quarter Form 10-Q repeated the financial information from the May 10, 2007 press release.

151.     The 2007 First Quarter Form 10-Q also reported adjusted net income, which purported to exclude the effects of FAS 133 losses of $205 million.  These losses were attributed to the "effect of hedging activities that did not qualify for hedge accounting treatment under FAS 133 or for which hedge accounting was not applied, including the related foreign exchange gains and losses. In the first quarter of 2007, AIG began applying hedge accounting for certain transactions, primarily in its Capital Markets operations."   Thus, the loss was attributed to fluctuations in the value of its own economic hedges, rather than derivative securities portfolios held by AIG.

152.     Both Sullivan and Bensinger certified the results reported in the 2007 First Quarter Form 10-Q, representing, *inter alia*, that (1) the report was free from untrue statements of material facts or material omissions and (2) that each had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding

the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

153.    Sullivan and Bensinger's certifications, along with the disclosures in AIG's May 10, 2007 press release and 2007 First Quarter Form 10-Q contained untrue statements of material fact and/or omitted material facts because the Company did not accurately value the liabilities in its credit derivatives portfolio, nor were the necessary controls in place to enable the Company to do so.  Nor did they adequately disclose the nature and existence of valuation disputes between AIG and its CDS counterparties, or incorporate those risks and the threat posed to the Company's liquidity and capital position.

154.    The Company's March 1, 2007 press release, its 2006 Form 10-K, as well as the certifications of Defendants Sullivan and Bensinger contained untrue statements of material fact and/or omitted material facts because the Company did not accurately value the liabilities in its credit derivatives portfolio, nor were the necessary controls in place to enable the Company to do so.  The Company's failure to properly account for these liabilities rendered AIG's financial statements untrue.  In particular, AIG failed to disclose that it had written billions in liquidity puts on CDOs linked to risky assets.  These put agreements required AIGFP to purchase certain CDOs at par, giving the put holder the option to exercise at the time a default on the underlying collateral was imminent or at least likely.  AIG would then have to take back the underlying assets in exchange for only the CDS price it had received when the credit quality of the assets was considered much higher.  The failure to disclose the significant exposure from these instruments rendered the Company's financial condition to be materially misstated.

155.   Furthermore, the financial results were untrue because the Company failed to incorporate its exposure to its CDS portfolio, including the risks presented to the Company's liquidity and financial position.   AIG failed to disclose the nature or extent of the disagreements AIG had with CDS counterparties that disputed the Company's CDS valuations, nor did AIG reveal the identities of its counterparties or the fact that the firms disputing AIG's valuations were highly regarded as experts in CDS modeling.   The Company's failure to disclose the significant risk posed by these collateral calls and to reasonably assess the impact of such collateral calls on the Company's liquidity and capital needs rendered its financial results materially untrue.

**F.   AIG'S SECOND QUARTER 2007 RESULTS CONTAIN UNTRUE STATEMENTS**

156.   On August 8, 2007, AIG issued a press release filed as an exhibit with the SEC on Form 8-K announcing its second quarter 2007 results and filed its Form 10-Q for the quarter ended June 30, 2007 ("2007 Second Quarter Form 10-Q").   The press release stated, in relevant part:

> American International Group, Inc. (AIG) today reported that its net income for the second quarter of 2007 was $4.28 billion or $1.64 per diluted share, compared to $3.19 billion or $1.21 per diluted share in the second quarter of 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses.
>
> Second quarter 2007 adjusted net income, as defined below, was a record $4.63 billion or $1.77 per diluted share, compared to $4.16 billion or $1.58 per diluted share in the second quarter of 2006.
>
> Net income for the first six months of 2007 was $8.41 billion or $3.21 per diluted share, compared to $6.39 billion or $2.43 per diluted share in the first six months of 2006. Adjusted net income for the first six months of 2007 was $9.02 billion or $3.44 per diluted share, compared to $7.53 billion or $2.87 per diluted share in the first six months of 2006.

157.    Further, the press release announced that its AIGFP division had produced significant revenues. "Capital Markets operating income increased 29.4 percent as *AIG Financial Products Corp. experienced increased transaction flow in its equity, credit and currency products compared to the second quarter of 2006*."  (Emphasis added.)

158.    In the press release accompanying the Company's earnings filing, CEO Sullivan was quoted as stating that "[AIG] continue[s] to be very comfortable with our exposure to the U.S. residential mortgage market, *both in our operations and our investment activities.*  However, in recognition of the significant investor interest in this topic, we will provide a presentation during our earnings call."  (Emphasis added.)

159.    Also on August 8, 2007, AIG filed its 2007 Second Quarter Form 10-Q. As they did with the 2007 First Quarter Form 10-Q, both Sullivan and Bensinger certified the results reported in the 2007 Second Quarter Form 10-Q, representing, *inter alia*, that (1) the report was free from untrue statements of material facts or material omissions and (2) that each had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

160.    The statements made by the Defendants in the August 8, 2007 earnings press release and 2007 Second Quarter Form 10-Q, contained untrue statements of material fact and/or omitted material facts.  In reality, AIG did not accurately value its CDS portfolio using actual market values of the derivatives as required by GAAP. Further, the August 8, 2007 earnings press release and 2007 Second Quarter Form 10-Q

did not disclose that the Company lacked the internal controls necessary to appropriately measure and account for the value of AIG's CDS portfolio. Specifically, the earnings release misrepresented the credit quality of the assets underlying the CDS portfolio, failing to disclose that by this time, defaults were a near certainty, and that the market value of the portfolio itself had declined substantially and that losses from these investments were to be expected.

## G.   AIG'S THIRD QUARTER 2007 FINANCIAL RESULTS CONTAIN UNTRUE STATEMENTS

161.   On November 7, 2007, the Company filed its third quarter Form 10-Q ("2007 Third Quarter Form 10-Q") after the close of the market and a press release announcing the Company's earnings for the quarter, filed on Form 8-K with the SEC (the "November 7, 2007 Form 8-K"). In the 2007 Third Quarter Form 10-Q, which was signed by Sullivan and Bensinger, AIG stated that "AIG continues to believe that it is *highly unlikely*" that AIGFP would ever actually have to make payments under its portfolio of credit default swaps. (Emphasis added.)

162.   Specifically, the press release filed with the November 7, 2007 Form 8-K stated that:

> American International Group, Inc. (AIG) today reported that its net income for the third quarter of 2007 was $3.09 billion or $1.19 per diluted share, compared to $4.22 billion or $1.61 per diluted share in the third quarter of 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses.

> Third quarter 2007 adjusted net income, as defined below, was $3.49 billion or $1.35 per diluted share, compared to $4.02 billion or $1.53 per diluted share in the third quarter of 2006.

> Included in both third quarter and nine months 2007 net income and adjusted net income was a charge of approximately $352 million pretax

($229 million after tax) for a net unrealized market valuation loss related to AIG Financial Product Corp.'s (AIGFP) super senior credit default swap portfolio. AIG continues to believe *that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives.*

Net income for the first nine months of 2007 was $11.49 billion or $4.40 per diluted share, compared to $10.61 billion or $4.04 per diluted share in the first nine months of 2006. Adjusted net income for the first nine months of 2007 was $12.51 billion or $4.79 per diluted share, compared to $11.55 billion or $4.40 per diluted share in the first nine months of 2006. (Emphasis added.)

163.   As reported in the press release, CEO Sullivan commented:

"In a volatile market environment that challenged many financial institutions, AIG reported adjusted net income of $3.49 billion in the third quarter of 2007 and increased book value per share to $40.81, once again confirming the benefits of our diversified portfolio of global businesses. While U.S. residential mortgage and credit market conditions adversely affected our results, *our active and strong risk management processes helped contain the exposure.* Our balance sheet remains strong with the financial resources to weather continued uncertainty as well as to take advantage of attractive market opportunities as they emerge.

Our Mortgage Guaranty business reported an operating loss in the quarter resulting from the continued deterioration in the U.S. housing market. American General Finance's adherence to disciplined underwriting standards has helped maintain the credit quality of its real estate portfolio. AIGFP reported an operating loss in the quarter due principally to the unrealized market valuation loss related to its super senior credit default swap portfolio. Although GAAP requires that AIG recognize changes in valuation for these derivatives, AIG continues to believe that *it is highly unlikely that AIGFP will be required to make any payments with respect to these derivatives*.

(Emphasis added.)

164.   The 2007 Third Quarter Form 10-Q and press release contained untrue statements of material fact and/or omitted material facts, and specifically failed to disclose the following:

(1)  The relatively modest losses for September and October 2007 reported by AIG in its CDS portfolio were calculated using an inadequate and improper valuation model.   Among other reasons, this model was inadequate under GAAP because it was based on generic credit spreads on asset-backed securities, rather than any actual market data;

(2)  AIG's reported losses in its portfolio of credit default swaps would have been substantially higher had AIG utilized the more appropriate market-based valuation model instead of relying on "generic" credit spreads; and

(3)  AIG's credit default swap positions were illiquid because the market for these derivatives had effectively disappeared;

(4)  AIG lacked adequate internal controls over its financial reporting and did not have the wherewithal to accurately to value its CDS portfolio or quantify the risk the CDS portfolio posed to the Company's liquidity and capital position.

165.   Defendants Bensinger and Sullivan certified that AIG's 2007 Third Quarter Form 10-Q:  (i) "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; and (ii) that "the financial statements, and other financial information included in [the Form 10-Q] fairly present[ed] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented."

166.   In addition, Defendants Bensinger and Sullivan each certified in the 2007 Third Quarter Form 10-Q that they had "[d]esigned such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

167.   The statements made by the Defendants in the earnings press release and Third Quarter Form 10-Q contained untrue statements of material fact and/or omitted material facts.  In reality, AIG did not accurately value its CDS portfolio using actual market values of the derivatives as required by GAAP.   Further, the earnings press release and 2007 Third Quarter Form 10-Q failed to disclose that the Company lacked the internal controls necessary to appropriately measure and account for the value of AIG's CDS portfolio.  Specifically, the earnings release misrepresented the credit quality of the assets underlying the CDS portfolio, failing to disclose that by this time, defaults were a near certainty, and that the market value of the portfolio itself had declined substantially and that losses from these investments were to be expected.

## H.   AIG MISSTATES ITS FINANCIAL CONDITION IN A DECEMBER 2007 DISCLOSURE

168.   On December 7, 2007, AIG filed a press release with the SEC on Form 8-K ("December 7, 2007 Form 8-K") that discussed an investor meeting held December 5, 2007 that was focused on the Company's exposure to the residential mortgage market.  In the press release, AIG stated that "[a]lthough it remains difficult to estimate the fair value of these derivatives due to continuing limitations on the availability of market observable data, AIG's best estimate of the further decline in the fair value of AIGFP's super senior credit derivatives since October 31, 2007 is approximately $500 million to $600 million as of November 30, 2007, or an aggregate of approximately $1.05 billion to $1.15 billion since September 30, 2007."  Furthermore, "AIG continues to believe that it is *highly unlikely* that AIGFP will be required to make payments with respect to these derivatives."  (Emphasis added.)

169.   The December 7, 2007 Form 8-K contained untrue statements of material fact and/or omitted material facts because, among other things:

(1)   Losses to AIG's super senior credit default swap portfolio in October and November 2007 were in excess of $4 billion greater than what AIG disclosed to investors in the December 7 Form 8-K;

(2)   AIG did not disclose the use of "cash flow diversion features" and "negative basis adjustment" to value its super senior CDS portfolio, nor did AIG disclose that the use of such netting features was improper;

(3)   As a result of the undisclosed "negative basis adjustments" to AIG's CDS portfolio, the valuation of the CDS portfolio was overstated by at least $3.6 billion;

(4)   The cash flow diversion features AIG utilized in valuing its CDS portfolio were improper and resulted in the value of the CDS portfolio to be materially overstated;

(5)   AIG had a "material weakness" in its internal controls over financial reporting related to the fair value of its super senior CDS portfolio at the same time AIG disclosed losses for this swap portfolio in the December 7 Form 8-K; and

(6)   They did not disclose that a growing number of AIG's CDS counterparties were vigorously disputed AIG's, that among those disputing such the valuations were firms highly regarded as experts in modeling and valuations of products such as CDSs; that the requested collateral calls were having a material impact on the Company's financial position.

## I.   AIG MISSTATES ITS FINANCIAL CONDITION IN A FEBRUARY 2008 DISCLOSURE

170.   On February 11, 2008, AIG filed a press release on Form 8-K ("February 11, 2008 Form 8-K"), reporting increased losses in its CDS portfolio.  AIG reported in the February 11, 2008 Form 8-K that the gross cumulative decline in valuation for the CDS credit swap portfolio through November 30, 2007 was $5.96 billion, or more than $4 billion greater than the net figure reported in December 2007.

171.   The February 11, 2008 Form 8-K also reported that a "cash flow diversion feature" and "negative basis adjustment" in AIG's December 7, 2007 disclosure reduced the previously reported $5.964 billion dollars in "gross" losses to approximately $1.4 to $1.5 billion in losses.  As reported in the February 11, 2008 Form 8-K, the "super senior" CDS portfolio losses reported in AIG's third quarter 2007 Form 10-Q were calculated using a modified Binomial Expansion Technique ("BET") that incorporated "generic" valuation inputs, as opposed to observed market-based inputs that AIG later adopted to calculate its losses, including "cash bond prices provided by the managers of the underlying CDO collateral pools, or, where not provided by the managers, prices derived from a price matrix based on cash bond prices that were provided."

172.   The February 11, 2008 Form 8-K also stated that AIG's independent auditor, PWC, "concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the super senior credit default swap portfolio."  Further, AIG stated that it "believes that it currently has in place the *necessary compensating controls and procedures to appropriately determine the fair value of AIGFP's super senior credit default swap portfolio for purposes of AIG's year-end financial statements*."

173.   The February 11, 2008 Form 8-K contained untrue statements of material fact and/or omitted material facts because, among other things, that Form 8-K failed to reveal:

(1)  That AIG did not, in fact, have in place the internal controls necessary to appropriately value its CDS portfolio, nor did it have a reasonable basis for believing that it did;

(2)   That, in fact, AIG's CDS counterparties had already submitted collateral calls based on declines in CDS values that had a material impact

on the Company's liquidity and financial position, yet the fact of those collateral calls had not been disclosed, nor had the Company disclosed the material impact these collateral calls had on AIG's financial position and its future prospects;

(3)  That AIG's CDS counterparties had already forced the Company to post undisclosed amounts in response to collateral posting requests;

(4)  The increased liquidity pressures resulting from the decreased valuations of its CDS portfolios had a concomitant, but unreported, effect on the Company's financial position; and

(5)  That, as a result of the decline in value of the CDS portfolio, AIG's capital position had been imperiled and would require the Company to raise billions of dollars in capital to provide collateral posting funds sought by undisclosed counterparties for undisclosed amounts.

## J.    AIG'S YEAR END 2007 FINANCIAL RESULTS CONTAIN UNTRUE STATEMENTS

174.    On February 28, 2008, AIG filed its Form 10-K for year-end 2007 ("2007 Form 10-K"), in which AIG announced that the cumulative value of its CDS portfolio was now at $11.5 billion and, as a result, AIG reported its largest quarterly loss ever of $5.3 billion.  That same day, AIG also issued a press release reporting its year-end 2007 financial results, filed as an exhibit to Form 8-K, which reported the Company's earnings as follows:

> American International Group, Inc. (AIG) today reported that its net income for full year 2007 was $6.20 billion or $2.39 per diluted share, compared to $14.05 billion or $5.36 per diluted share for full year 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. Full year 2007 adjusted net income, as shown below, was $9.31 billion or $3.58 per diluted share, compared to $15.41 billion or $5.88 per diluted share for full year 2006.

175.    With regard to AIG's CDS portfolio, the press release stated as follows:

> Included in both the full year and fourth quarter 2007 net income (loss) and adjusted net income (loss) were charges of approximately $11.47 billion pretax ($7.46 billion after tax) and $11.12 billion pretax ($7.23 billion after tax),

respectively, for a net unrealized market valuation loss related to the AIG Financial Products Corp. (AIGFP) super senior credit default swap portfolio.

AIG continues to believe that the unrealized market valuation losses on this super senior credit default swap portfolio are not indicative of the losses AIGFP may realize over time.  Under the terms of these credit derivatives, losses to AIG would result from the credit impairment of any bonds AIG would acquire in satisfying its swap obligations.

Based upon its most current analyses, *AIG believes that any credit impairment losses realized over time by AIGFP will not be material to AIG's consolidated financial condition,* although it is possible that realized losses could be material to AIG's consolidated results of operations for an individual reporting period. Except to the extent of any such realized credit impairment losses, AIG expects AIGFP's unrealized *market valuation losses to reverse over the remaining life of the super senior credit default swap portfolio.*

176.    Further, AIG's 2007 Form 10-K reported that the Company's CDS portfolio included $6.5 billion in liquidity puts written on CDOs linked to the subprime mortgage market.  These put agreements required AIGFP to purchase certain CDOs at par, provided the securities did not suffer a default.  These put agreements represented substantial near-term liabilities.  Owners of these puts would not likely exercise them until it was apparent that a default on the underlying collateral was imminent or at least likely.  AIG would then have to take back the underlying assets in exchange for only the CDO price it had received when the credit quality of the assets was considered much higher.  In other words, the puts allowed purchasers of the subprime CDOs to force AIG to buy them back at the original price, despite the fact they had declined in value.

177.    The 2007 Form 10-K also reported that, pursuant to the terms of the liquidity puts, AIG had repurchased $754 million of these securities, and had provided third parties with $3 billion in liquidity facilities in case AIGFP was required to repurchase additional CDOs over the next three years.

178.    The 2007 Form 10-K also disclosed that AIGFP had received collateral calls from counterparties with respect to certain CDS and that "AIG is aware that valuation estimates made by certain of the counterparties with respect to certain super senior credit default swaps or the underlying reference CDO securities, for purposes of determining the amount of collateral required to be posted by AIGFP in connection with such instruments, differ significantly from AIGFP's estimates."  However, the Company stated that:

> AIGFP has been able to successfully resolve some of the differences, including in certain cases entering into compromise collateral arrangements, some of which are for specified periods of time.  AIGFP is also in discussions with other counterparties to resolve such valuation differences. As of February 26, 2008, AIGFP had posted collateral (or had received collateral, where offsetting exposures on other transactions resulted in the counterparty posting to AIGFP) based on exposures, calculated in respect of super senior default swaps, in an aggregate amount of approximately $5.3 billion.  Valuation estimates made by counterparties for collateral purposes were considered in the determination of the fair value estimates of AIGFP's super senior credit default swap portfolio.

179.    The 2007 Form 10-K also noted that AIGFP and the Company's risk management department conducted risk analyses of the CDS portfolio to measure the potential loss over the life of the portfolio and to assess the impact of scenarios involving "further stress" triggered by ratings downgrades.  Under these stress tests, even when "[n]o benefit was taken…for cash flow diversion features, recoveries upon default or other risk mitigant benefits," AIG believed any losses realized over time by AIGFP "will not be material to AIG's consolidated financial condition" although it was possible that such realized losses could be material to AIG's consolidated results for an individual reporting period.   According to the 2007 Form 10-K, there was no probable and reasonably estimable loss in the CDS portfolio at December 31, 2007.

180.   The 2007 Form 10-K and the February 28, 2008 Form 8-K contained untrue statements of material fact, because, among others:

(1)  AIG failed to reveal the extent and the number of the disagreements between AIG and its CDS counterparties that had disputed the Company's CDS valuations, nor did AIG reveal its counterparty identities or that the firms disputing AIG's valuations were highly regarded as experts in CDS modeling;

(2)  In particular, AIG failed to disclose that a counterparty that had sought a $1.5 billion collateral posting as early as August 2007 was Goldman Sachs & Co.;

(3)  AIG's CDS counterparties had already submitted collateral calls based on declines in CDS values that had a material impact on the Company's liquidity and financial position, yet the fact of those collateral calls, which had been received as early as August 2007, had not been fully and properly disclosed, nor had the Company disclosed the material impact these collateral calls had on AIG's financial position and its future prospects;

(4)  The increased liquidity pressures resulting from the decreased valuations of its CDS portfolios had a concomitant, but unreported, effect on the Company's financial position;

(5)  As a result of the decline in value of the CDS portfolio, AIG's capital position had been imperiled and would require the Company to raise billions of dollars in capital to stave off impending collateral calls; and

(6)  AIG was not able to accurately assess the value of its CDS portfolio or the exposure it represented to the Company.

## K.   AIG'S FIRST QUARTER 2008 FINANCIAL RESULTS CONTAIN UNTRUE STATEMENTS

181.   On May 8, 2008, after the market close, AIG announced its results for the quarter ended March 31, 2008, and reported its first quarter results on Form filed its Form 10-Q ("First Quarter 2008 10-Q").  According to the press release filed with the SEC on Form 8-K, "[i]ncluded in the first quarter 2008 net loss and adjusted net loss was a pre-tax charge of approximately $9.11 billion ($5.92 billion after tax) for a net unrealized

market valuation loss related to the AIG Financial Products Corp. (AIGFP) super senior credit default swap portfolio." Further, the press release reported that:

> [T]he continuation of the weak U.S. housing market, the disruption in the credit markets, as well as equity market volatility, had a substantial adverse effect on its results for the first quarter ended March 31, 2008. These factors were primarily responsible for AIG incurring a net loss for the first quarter of 2008 of $7.81 billion or $3.09 per diluted share. For the 2007 first quarter, in which none of these external conditions existed in a material fashion, AIG reported net income of $4.13 billion or $1.58 per diluted share. First quarter 2008 adjusted net loss, as defined below, was $3.56 billion or $1.41 per diluted share, compared to adjusted net income of $4.39 billion or $1.68 per diluted share for the first quarter of 2007.

182.    Further, "AIG emphasized that despite the difficult environment and its resulting effect on AIG's overall financial performance for the first quarter, core insurance businesses continue to perform satisfactorily. *AIG is confident that, although present economic conditions are difficult, AIG's unmatched competitive advantages, strong brand, and unmatched global franchise position it extremely well for the future.*" (Emphasis added.)

183.    The Form 8-K also announced AIG's plan to raise approximately $12.5 billion in capital to "fortify its balance sheet and provide increased financial flexibility" and a later capital raise which were "designed to further strengthen AIG's significant financial resources and will enhance its ability to grow while maintaining the strength to withstand potential short-term market volatility."

184.    As to the CDS portfolio, AIG reported in the Form 8-K that, included in the loss for the quarter was a "net loss and adjusted net loss was a pre-tax charge of approximately $9.11 billion ($5.92 billion after tax) for a net unrealized market valuation loss related to the AIG Financial Products Corp. (AIGFP) super senior credit default swap portfolio."

185.    CEO Sullivan commented in the press release that "AIG's results do not reflect the underlying strengths and potential of AIG; rather they reflect the extremely adverse external conditions affecting the spectrum of companies exposed to the U.S. residential housing, credit and capital markets.  The sizable unrealized losses and decline in partnership income were among the key drivers impairing our overall net performance.  With that said, it is important to underscore that our operating strategies are working well in our core insurance businesses.  We believe that our businesses provide an attractive foundation for growth for AIG over the long-term."  Further, CEO Sullivan stated that "We have established, well run businesses in our chosen markets around the globe and are confident we have the right strategies and resources to succeed.  With the support of the newly added capital, we have every confidence in our ability to respond to today's market conditions and opportunities that may arise."

186.    The First Quarter 2008 Form 10-Q and the May 8, 2008 Form 8-K contained untrue statements of material fact and/or omitted material facts because, among other reasons:

(1)  AIG's CDS counterparties had disputed the Company's CDS valuations, and that many counterparties had already requested collateral calls since August 2007;

(2)  The Company failed to disclose the material impact these collateral calls had on AIG's financial position and its future prospects;

(3)  The increased liquidity pressures resulting from the decreased valuations of its CDS portfolios had a concomitant, but unreported, effect on the Company's financial position; and

(4)  That, contrary to statements filed with the SEC, AIG was required to raise capital to satisfy collateral calls from CDS counterparties; and

(5)  AIG failed to reveal pending investigations by regulatory authorities relating to its valuation and reporting of the CDS portfolio.

**L.      DISCLOSURES FOLLOWING THE MAY 12, 2008 OFFERING**

187.    On May 20, 2008, AIG announced that it would raise over $20 billion in new capital to fortify itself from future losses related to its residential mortgage exposure, which AIG stated was due "strong demand" by investors for AIG securities.

188.    Even following AIG's substantial raise, Moody's downgraded AIG debt to Aa3 from Aa2 and assigned the Company a "negative" outlook, citing market losses on CDSs and realized losses of $5 billion on residential mortgage-backed securities, as well as uncertainty surrounding the strategic direction of AIGFP.

189.    On June 6, 2008, reports surfaced that AIG was being investigated by authorities from both the SEC and the United States Department of Justice.  As reported in *The Wall Street Journal*, the probes related to the Company's handling of its CDS portfolio valuations and the Company's February 2008 disclosures revealing the improper valuations in the portfolio.

190.    Significantly, as reported, valuation disputes between AIG and some of its CDS counterparties, such as Goldman Sachs, prompted the attention of regulators and the United States Department of Justice, through the U.S. Attorney's Office in the Eastern District of New York.  It was further disclosed that New York state insurance regulators had initiated a probe into AIG derivatives accounting and had already had extensive discussions with AIG management.  Like the SEC and United States Department of Justice inquiries, the New York Insurance Commissioner's investigation was focused on whether losses were understated in the Company's CDS portfolio.

191.    After mounting losses in AIG's CDS portfolio prompted further collateral calls and compounded AIG's undisclosed liquidity risks, the Company was eventually forced to seek an unprecedented bailout from the federal government.  As AIG's crisis

became a matter of national concern, disclosures began to reveal that the Offering Materials contained numerous additional untrue statements and material omissions.

192.    Specifically, by mid-September, the continuing troubles stemming from AIG's CDS exposure appeared to be pushing the Company toward bankruptcy. Fearing that the collapse of the world's largest insurer could send ripple effects through the global economy, on September 24, 2008, the U.S. Federal Reserve extended AIG an unprecedented $85 billion emergency loan in exchange for a 79.9 percent stake in the Company. Following the government bailout, a congressional oversight committee initiated an investigation into the practices at AIG and called on senior executives of the Company to testify before Congress regarding, among other things, AIG's valuation and financial reporting of the its CDS portfolio.

193.    On November 10, 2008, AIG disclosed that as "of September 30, 2008, AIGFP had either agreed to post or posted collateral based on exposures, calculated in respect of super senior credit default swaps, in an aggregate net amount of $32.8 billion."

194.    These disclosures began to reveal the Company's true financial condition and harmed investors by causing a significant decline in the value of the securities purchased in or traceable to the Offerings.

## M.    <u>UNDERWRITING OF OFFERINGS</u>

195.    The Underwriter Defendants are liable under Sections 11 and 12(a)(2) of the Securities Act to investors who purchased AIG securities on or traceable to the respective Offerings each underwrote. Specifically, the Underwriter Defendants' respective liability for the Offerings is as follows:

| OFFERING | UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION AS STATED IN OFFERING MATERIALS) |
|---|---|
| March 6, 2007 Offering | BoA ($150,000,000)<br>Citigroup ($200,000,000)<br>Deutsche ($200,000,000)<br>JPMSI ($200,000,000)<br>Merrill Lynch ($25,000,000)<br>Morgan Stanley ($25,000,000)<br>Scotia ($25,000,000)<br>Wachovia ($25,000,000) |
| March 13, 2007 4.95% Offering | Goldman ($240,000,000)<br>Greenwich ($240,000,000)<br>Daiwa Europe ($40,020,000)<br>Mitsubishi ($39,960,000)<br>Mizuho ($40,020,000) |
| March 13, 2007 Floating Rate Offering | Goldman ($120,000,000)<br>Greenwich ($120,000,000)<br>Daiwa America ($20,010,000)<br>Mitsubishi ($19,980,000)<br>Mizuho ($20,010,000) |
| May 15, 2007 Offering | Barclays ($240,890,000)<br>Morgan Stanley ($240,805,000)<br>Wachovia ($240,805,000)<br>ANZ ($31,875,000)<br>BMO ($31,875,000)<br>Keybanc ($31,875,000)<br>NAB Capital ($31,875,000). |
| May 25, 2007 Offering | Morgan Stanley ($200,000,000) |
| May 31, 2007 Offering | Citigroup ($121,250,000)<br>Merrill Lynch ($121,250,000)<br>Morgan Stanley ($121,250,000)<br>UBS ($121,250,000)<br>Wachovia ($121,250,000)<br>AG Edwards ($22,500,000)<br>RBC Dain ($22,500,000)<br>BoA ($7,500,000)<br>Bear Stearns ($7,500,000)<br>Wells Fargo ($7,500,000)<br>Charles Schwab ($3,125,000)<br>Credit Suisse ($3,125,000)<br>Deutsche Bank ($3,125,000)<br>H&R Block ($3,125,000)<br>HSBC ($3,125,000) |

|  | Janney ($3,125,000) |
|---|---|
|  | J.J.B. Hilliard ($3,125,000) |
|  | Keybanc ($3,125,000) |
|  | Oppenheimer ($3,125,000) |
|  | Piper Jaffray ($3,125,000) |
|  | Raymond James ($3,125,000) |
|  | TD Ameritrade ($3,125,000) |
|  | C.L. King ($1,250,000) |
|  | Crowell Weedon ($1,250,000) |
|  | DA Davidson ($1,250,000) |
|  | Davenport ($1,250,000) |
|  | Doley ($1,250,000) |
|  | Ferris Baker ($1,250,000) |
|  | Fidelity ($1,250,000) |
|  | Fixed Income ($1,250,000) |
|  | Guzman ($1,250,000) |
|  | Jefferies ($1,250,000) |
|  | Keefe Bruyette ($1,250,000) |
|  | Mesirow ($1,250,000) |
|  | Morgan Keegan ($1,250,000) |
|  | Muriel ($1,250,000) |
|  | Pershing ($1,250,000) |
|  | Robert W. Baird ($1,250,000) |
|  | Ryan Beck ($1,250,000) |
|  | Samuel A Ramirez ($1,250,000) |
|  | Stifel Nicolaus ($1,250,000) |
|  | Stone ($1,250,000) |
|  | SunTrust ($1,250,000) |
|  | Wedbush ($1,250,000) |
|  | William Blair ($1,250,000) |
| October 4, 2007 Offering | Wachovia ($200,000,000) |
| December 7, 2007 Offering | BoA ($708,334,000) |
|  | Credit Suisse ($708,333,000) |
|  | Daiwa America ($62,500,000) |
|  | Keybanc ($62,500,000) |
|  | Mitsubishi ($62,500,000) |
|  | Mizuho ($62,500,000) |
|  | Scotia ($62,500,000) |
|  | SG Americas ($62,500,000) |
| December 11, 2007 Offering | Merrill ($147,145,000) |
|  | Morgan Stanley ($147,145,000) |
|  | UBS ($147,145,000) |
|  | Wachovia ($147,145,000) |
|  | BoA ($50,000,000) |
|  | Bear Stearns ($50,000,000) |
|  | RBC Dain ($50,000,000) |

| | |
|---|---|
| | Wells Fargo ($10,000,000)<br>Charles Schwab ($4,175,000)<br>Fidelity ($4,175,000)<br>H&R Block ($4,175,000)<br>HSBC ($4,175,000)<br>J.J.B. Hilliard ($4,175,000)<br>Janney ($4,175,000)<br>KeyBanc ($4,175,000)<br>Oppenheimer ($4,175,000)<br>Pershing ($4,175,000)<br>Piper Jaffray ($4,175,000)<br>Raymond James ($4,175,000)<br>Robert W. Baird ($4,175,000)<br>Stifel Nicolaus ($4,175,000)<br>B.C. Ziegler ($1,250,000)<br>BB&T ($1,250,000)<br>Blaylock ($1,250,000)<br>BOSC ($1,250,000)<br>C. L. King & ($1,250,000)<br>City ($1,250,000)<br>Credit Suisse ($1,250,000)<br>Crowell ($1,250,000)<br>D.A. Davidson ($1,250,000)<br>Deutsche Bank ($1,250,000)<br>Doley ($1,250,000)<br>Ferris ($1,250,000)<br>Fixed Income ($1,250,000)<br>Guzman ($1,250,000)<br>Jefferies ($1,250,000)<br>Keefe Bruyette ($1,250,000)<br>Loop ($1,250,000)<br>Maxim ($1,250,000)<br>Mesirow ($1,250,000)<br>Morgan Keegan ($1,250,000)<br>Muriel ($1,250,000)<br>Samuel A. Ramirez ($1,250,000)<br>Stone ($1,250,000)<br>SunTrust ($1,250,000)<br>TD Ameritrade ($1,250,000)<br>Toussaint ($1,250,000)<br>Utendahl Partners ($1,250,000)<br>Vining-Sparks ($1,250,000)<br>Wedbush ($1,250,000)<br>William Blair ($1,250,000)<br>Williams ($1,250,000) |
| May 12, 2008 Equity Unit | Citigroup (24,607,800 Equity Units) |

| Offering | JPMSI (24,607,800 Equity Units) |
|---|---|
| | BoA (4,320,000 Equity Units) |
| | Merrill (4,320,000 Equity Units) |
| | Morgan Stanley (4,320,000 Equity Units) |
| | UBS (4,320,000 Equity Units) |
| | Wachovia (4,320,000 Equity Units) |
| | Dowling (306,000 Equity Units) |
| | Fox-Pitt (306,000 Equity Units) |
| | Keefe Bruyette (306,000 Equity Units) |
| | Williams (108,000 Equity Units) |
| | Loop (39,600 Equity Units) |
| | Muriel (39,600 Equity Units) |
| | Toussaint (39,600 Equity Units) |
| | Utendahl (39,600 Equity Units) |
| May 12, 2008 Common Stock Offering | Citigroup (58,461,512 shares) |
| | JPMSI (58,461,512 shares) |
| | Credit (10,263,158 shares) |
| | Deutsche (10,263,158 shares) |
| | Merrill (10,263,158 shares) |
| | Wachovia (10,263,158 shares) |
| | Dowling (726,974 shares) |
| | Fox-Pitt (726,974 shares) |
| | Keefe Bruyette (726,974 shares) |
| | Williams (256,579 shares) |
| | Loop (94,079 shares) |
| | Muriel (94,079 shares) |
| | Toussaint (94,079 shares) |
| | Utendahl (94,079 shares) |

## CAUSES OF ACTION

### COUNT I

**For Violations Of Section 11 Of The Securities
Act Against All Defendants**

196.    This Count is asserted against AIG, the Individual Defendants, the

Underwriter Defendants, and PWC for violations of Section 11 of the Securities Act,

15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise

acquired the securities sold on the Offerings.

197.    Liability under this Count is predicated on these Defendants' respective participation in the Offerings, which were conducted pursuant to the Shelf Registration Statement.  The Shelf Registration Statement contained untrue statements and omissions of material fact.  This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

198.    The Shelf Registration Statements contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading.  The specific documents containing such untrue statements and omissions that were incorporated by reference in the Shelf Registration Statements with regard to each Offering are identified in the charts provided herein.

199.    By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired the securities sold on the Offerings pursuant to the Shelf Registration Statements.

## COUNT II

### For Violations Of Section 12 Of The Securities Act Against AIG And The Underwriter Defendants

200.    This Count is asserted against AIG and the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired AIG securities in the Offerings.

201.    The AIG Defendants and the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities issued in the Offerings pursuant to the Offering Materials.   These Offering Materials, including prospectuses, prospectus supplements and pricing supplements incorporated therein, contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth in the charts provided herein.

202.    By reason of the foregoing, AIG and the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased the securities sold on the Offerings pursuant to the applicable Offering Materials.

## COUNT III

### For Violations Of Section 15 Of The Securities Act
### Against AIG and The Individual Defendants

203.    This Count is asserted against AIG and the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired AIG securities sold on the Offerings.

204.    At times relevant hereto, AIG was a controlling person of the AIG Defendants (other than AIG itself) within the meaning of Section 15 of the Securities Act.  Because of its position of control and authority over the other AIG Defendants, AIG was able to, and did, control the contents of the Shelf Registration Statements and related Offering Materials, which contained untrue statements of material fact.

205.    At times relevant hereto, the Individual Defendants were controlling persons of AIG within the meaning of Section 15 of the Securities Act.  Each of the

Individual Defendants served as an executive officer and/or director of AIG prior to and at the time of the Offerings.

206.    The Individual Defendants at times relevant hereto participated in the operation and management of AIG, and conducted and participated, directly and indirectly, in the conduct of AIG's business affairs.  As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to AIG's financial condition and results of operations.  Because of their positions of control and authority as officers or directors of AIG, the Individual Defendants were able to, and did, control the contents of the Shelf Registration Statement, which contained materially untrue financial information.

207.    By reason of the foregoing, AIG and the Individual Defendants are liable under Section 15 of the Securities Act, to the same extent that AIG is liable under Sections 11, 12(a)(2) of the Securities Act, to Plaintiffs and the other members of the Class who purchased the securities sold on the Offerings pursuant to the Shelf Registration Statements and/or the applicable Offering Materials.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.    Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding compensatory damages in favor of Plaintiff and all members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

Dated: December 4, 2008
New York, New York

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**

Gerald H. Silk
Noam Mandel
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444
jerry@blbglaw.com
noam@blbglaw.com
*Counsel for Fire and Police Pension
Association of Colorado*

**DONALDSON & GUIN, LLC**
David J. Guin
Tammy McClendon Stokes
505 20th Street North, Suite 1000
Birmingham, Alabama 35203
Telephone: (205) 226-2282
Fax: (205) 226-2357
davidg@dglawfirm.com
*Counsel for M. Clay Ragsdale, IV*

**BARROWAY TOPAZ KESSLER
MELTZER CHECK LLP**

Sean M. Handler
Darren J. Check
Naumon A. Amjed
280 King of Prussia Road

66

Radnor, PA  19087
(610) 667-7706
(610) 667-7056 (fax)
shandler@btkmc.com
dcheck@btkmc.com
namjed@btkmc.com

*Additional Plaintiffs' Counsel*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Kevin B. Lindahl, on behalf of the Fire & Police Pension Association of Colorado ("FPPAC"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the General Counsel for FPPAC. I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

2. FPPAC did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. FPPAC is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. FPPAC's transactions in the American International Group, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. FPPAC has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but was not appointed lead plaintiff:

*Operative Plasterers and Cement Masons International Association Local 262 Annuity Fund v. Lehman Brothers Holdings, Inc. et al.*, Case No. 08-cv-5523 (S.D.N.Y.)

6. FPPAC will not accept any payment for serving as a representative party on behalf of the Class beyond FPPAC's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4 day of December, 2008.

Kevin B. Lindahl
General Counsel
Fire & Police Pension Association of Colorado

**Fire & Police Pension Association of Colorado**

**Transactions in American International Group Inc.**

6.25 % Series A-1 Junior Subordinated Debentures Due
3/15/2037

| Transaction | Trade Date | Amount | Price |
|---|---|---|---|
| Purchase | 3/6/2007 | 250,000 | 99.5160 |
| Purchase | 3/14/2007 | 100,000 | 100.948 |
| Purchase | 3/14/2007 | 100,000 | 100.934 |
| Purchase | 3/16/2007 | 100,000 | 99.7960 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, M. Clay Ragsdale, IV, hereby certify, as to the claims asserted under the federal securities laws, that:

1.      I am attorney in fact for Milton C. Ragsdale and Jean R. Ragsdale ("the Ragsdales"). I manage all the investments of and have full investment discretion and authority for the Ragsdales. Pursuant to that authority, I caused the securities that are the subject of this action to be purchased for the Ragsdales' accounts. Those securities were not purchased at the direction of counsel or in order to participate in any action arising under the federal securities laws.

2.      I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

3.      I am willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.      The Ragsdales' transactions in the American International Group, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5.      Neither I nor the Ragsdales have sought to serve as a lead plaintiff and representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _4th_ day of December, 2008.

M. Clay Ragsdale, IV

**The Ragsdales**
**Transactions in American International Group Inc.**
7.70% Series A-5 Junior Subordinated Debentures Due
12/18/2062 ("AVF")

**Milton C. Ragsdale & Jean R. Ragsdale, Joint Tenants**

| Transaction | Trade Date | Shares | Price |
|---|---|---|---|
| Purchase | 12/11/2007 | 1,200 | 25.0000 |

**Milton C. Ragsdale, MD Rollover IRA**

| Transaction | Trade Date | Shares | Price |
|---|---|---|---|
| Purchase | 12/11/2007 | 1,200 | 25.0000 |