UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN INTERNATIONAL GROUP, INC. 2008 SECURITIES LITIGATION | MASTER FILE 08 Civ. 4772 (LTS)(KNF) **ORAL ARGUMENT REQUESTED** |

This Document Relates to:

08 Civ. 4772 (LTS)(KNF), JACKSONVILLE POLICE AND FIRE PENSION FUND

08 Civ. 10586 (LTS), FIRE AND POLICE PENSION ASSOCIATION OF COLORADO

08 Civ. 8659 (LTS), CARROLL

08 Civ. 9162 (LTS), BERNSTEIN

09 Civ. 428 (LTS), EPSTEIN REAL ESTATE ADVISORY

## UNDERWRITER DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

Richard A. Rosen
Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990

Charles E. Davidow
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Fax: (202) 223-7420

*Attorneys for Underwriter Defendants*

**Table of Contents**

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT AND STATEMENT OF FACTS .................................... 1

ARGUMENT ......................................................................................... 5

I.      PLAINTIFFS FAIL TO ALLEGE A  MATERIALLY MISLEADING
        STATEMENT OR OMISSION ............................................................. 5

   A.   Plaintiffs Fail to Allege a Misleading Statement or Omission Regarding the
        Writing of Credit Default Swap Contracts (Compl. ¶ 594(a)) ................................. 7
   B.   Plaintiffs Fail to Allege a Misleading Statement or Omission Regarding the
        Valuation of CDOs Underlying AIG CDSs (Compl. ¶ 594(c)) ............................ 10
   C.   Plaintiffs Fail to Allege a Misleading Statement or Omission Regarding AIG's
        Securities Lending Program (Compl. ¶ 594(b)) ............................................ 14
   D.   Plaintiffs Fail to Allege a Misleading Statement or Omission Regarding the Cash
        Collateral Requirement in the Securities Lending Program (Compl. ¶ 594(d)) ... 19
   E.   Plaintiffs Fail to Allege a Misleading Statement or Omission Regarding AIG's
        Concentration of Credit Risk in the Subprime Market (Compl. ¶ 594(e))............ 23

II.     AIG HAD NO DUTY TO DISCLOSE THAT CERTAIN OF THE
        UNDERWRITERS OF AIG SECURITIES WERE ALSO COUNTERPARTIES
        OF AIG WITH RESPECT TO THE CDS PORTFOLIO AND SECURITIES
        LENDING PROGRAM ..................................................................... 24

III.    PLAINTIFFS LACK STANDING TO ASSERT CLAIMS ARISING FROM
        CERTAIN OFFERINGS LISTED IN THE COMPLAINT................................. 31

IV.     CERTAIN CLAIMS ARE TIME-BARRED ........................................... 36

V.      PLAINTIFFS FAIL TO STATE A CLAIM FOR WHICH RELIEF CAN  BE
        GRANTED AS TO THE 5.60% MEDIUM-TERM NOTES BECAUSE THE
        ONLY NAMED PLAINTIFF WHO PURCHASED THOSE NOTES SOLD AT
        A PROFIT ................................................................................ 39

CONCLUSION ...................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acito* v. *IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995).................................................................................................18

*Am. High-Income Trust* v. *Allied Signal*,
    329 F. Supp. 2d 534 (S.D.N.Y. 2004)............................................................................37

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir.1989).........................................................................................12

*In re Ashanti Goldfields Sec. Litig.*,
    184 F. Supp. 2d 247 (E.D.N.Y. 2002)...........................................................................17

*In re Authentidate Holding Corp. Sec. Litig.*,
    No. 05 Civ 5323, 2009 WL 755360 (S.D.N.Y. Mar. 23, 2009).......................10, 13, 18

*In re Authentidate Holding Corp. Sec. Litig.*,
    No. 05 Civ. 5323, 2006 WL 2034644 (S.D.N.Y. July 14, 2006)...............................31, 39

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)...........................................................................17

*Benzon* v. *Morgan Stanley Distribs., Inc.*,
    420 F.3d 598 (6th Cir. 2005)............................................................................................6

*In re Broderbund/Learning Co. Sec. Litig.*,
    294 F.3d 1201 (9th Cir. 2002).......................................................................................39

*Caiafa* v. *Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007)...........................................................................35

*In re Canandaigua Sec. Litig.*,
    944 F. Supp. 1202 (S.D.N.Y. 1996)...........................................................................9, 17

*Castillo* v. *Dean Witter Discover & Co.*,
    No. 97 Civ. 1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998)................................14, 30

*In re Centerline Holdings Co. Sec. Litig.*,
    No. 08 Civ. 505, 2009 WL 86850 (S.D.N.Y. Jan. 12, 2009).........................................14

*Coronel* v. *Quanta Capital Holdings Ltd.*,
    No. 07 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)..................................7, 21

*Cortec Indus. Inc.* v. *Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991).............................................................................................35

*In re Cosi, Inc. Sec. Litig.*,
   379 F. Supp. 2d 580 (S.D.N.Y. 2005) ....................................................................... 6, 10, 35

*Degulis* v. *LXR Biotechnology, Inc.*,
   928 F. Supp. 1301 (S.D.N.Y. 1996) .................................................................................. 27

*DeMaria* v. *Andersen*,
   153 F. Supp. 2d 300 (S.D.N.Y. 2001) .............................................................................. 29

*In re Digital Island Sec. Litig.*,
   223 F. Supp. 2d 546 (D. Del. 2002),
   *aff'd* 357 F.3d 302 (3d Cir. 2004) ............................................................................. 12, 14

*In re Friedman's, Inc. Sec. Litig.*,
   385 F. Supp. 2d 1345 (N.D. Ga. 2005) ............................................................................ 33

*Garber* v. *Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008).............................................................................. 22

*Geiger* v. *Solomon-Page Group, Ltd.*,
   933 F. Supp. 1180 (S.D.N.Y. 1996)............................................................................. 6, 14

*In re Global Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003)............................................................................. 32

*Good Hill Partners L.P.* v. *WM Asset Holdings Corp. CI*
   *2007-WM2*, 583 F. Supp. 2d 517 (S.D.N.Y. 2008)........................................................ 21

*Halperin* v. *eBanker USA.com, Inc.*,
   40 Fed. Appx. 624 (2d Cir. 2002) ................................................................................... 29

*In re Harmonic, Inc., Sec. Litig.*,
   No. C 00-2287, 2006 WL 3591148 (N.D. Cal. Dec. 11, 2006) ....................................... 35

*Hoffman* v. *UBS-AG*,
   591 F. Supp. 2d 522 (S.D.N.Y. 2008)........................................................................ 31, 33

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003).............................................................................. 39

*In re Initial Public Offering Sec. Litig.*,
   214 F.R.D. 117 (S.D.N.Y. 2002) ..................................................................................... 32

*J & R Mktg., SEP* v. *Gen. Motors Corp.*,
   549 F.3d 384 (6th Cir. 2008)......................................................................................... 6, 14

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005).............................................................................. 22

*Lenz* v. *Associated Inns & Rests. Co. of Am.*,
    833 F. Supp. 362 (S.D.N.Y. 1993)........................................................................37

*Longden* v. *Sunderman*,
    737 F. Supp. 968 (N.D. Tex. 1990)......................................................................12

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003).............................................................6, 13

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
    434 F. Supp. 2d 233 (S.D.N.Y. 2006)....................................................................6

*Miller* v. *Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)....................................................................7

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
    No. 03 Civ. 8208, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) .................6, 13

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    No. 02 Civ. 6153, 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009) ...........................5

*In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*,
    448 F. Supp. 2d 466 (E.D.N.Y. 2006).............................................................17, 29

*Nolte* v. *Capital One Fin. Corp.*,
    390 F.3d 311 (4th Cir. 2004)................................................................................24

*In re Novagold Res. Inc. Sec. Litig.*,
    __ F. Supp. 2d __, 2009 WL 1575220 (S.D.N.Y. 2009)....................................29

*Ong* v. *Sears, Roebuck & Co.*,
    388 F. Supp. 2d 871 (N.D. Ill. 2004) ..................................................................33

*Oxford Asset Mgmt., Ltd.* v. *Jaharis*,
    297 F.3d 1182 (11th Cir. 2002)..............................................................................6

*Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)...............................................................7, 18

*In re Paracelsus Corp. Sec. Litig.*,
    6 F. Supp. 2d 626 (S.D. Tex. 1998) ....................................................................32

*Pinter* v. *Dahl*,
    486 U.S. 622 (1988).............................................................................................35

*Press* v. *Quick & Reilly, Inc.*,
    218 F.3d 121 (2d Cir. 2000).................................................................................13

*Resnik* v. *Swartz*,
    303 F.3d 147 (2d Cir. 2002)...........................................................................................13

*Rubin* v. *MF Global, Ltd.*,
    __ F. Supp. 2d __, No. 08 Civ. 2233, 2009 WL 2058590 (S.D.N.Y. July 16, 2009) .......21

*San Leandro Emergency Med. Group Profit Sharing Plan* v. *Phillip Morris Co., Inc.*,
    75 F.3d 801 (2d. Cir. 1996)...........................................................................................18

*Schoenhaut* v. *American Sensors, Inc.*,
    986 F. Supp. 785 (S.D.N.Y. 1997)...................................................................................7

*Scibelli* v. *Roth*,
    No. 98 Civ 7228, 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000) ........................................18

*SEC* v. *Scott*,
    565 F. Supp. 1513 (S.D.N.Y. 1983)................................................................................27

*Stonecipher* v. *Lehman ABS Corp.*,
    No. 04 Civ. 4057, 2006 WL 1458507 (S.D.N.Y. May 26, 2006) .................................6, 14

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000)................................................................................6

*United States* v. *Lake*,
    472 F.3d 1247 (10th Cir. 2007).......................................................................................13

*Vladimir* v. *Bioenvision, Inc.*,
    606 F. Supp. 2d 473 (S.D.N.Y. 2009)........................................................................14, 18

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004).....................................................................27, 29, 30

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 431 (S.D.N.Y. 2003).............................................................................36

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003).............................................................................32

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994).....................................................................................12, 22

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
    No. 07 Civ. 3994, 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) .........................................5

*In re Zyprexa Prods. Liab. Litig.*,
    549 F. Supp. 2d 496 (E.D.N.Y. 2003).............................................................................36

## STATUTES

15 U.S.C. § 77m ........................................................................................................................... 36

Section 11 of the Securities Act of 1933 ("Securities Act") .................................................. passim

Section 12(a)(2) of the Securities Act .................................................................................... passim

Section 13 of the Securities Act .............................................................................................. 36

Securities Act ......................................................................................................................... passim

## OTHER AUTHORITIES

17 C.F.R. § 229.101 ................................................................................................................... 9

17 C.F.R. § 229.303 ............................................................................................................. 9, 17

17 C.F.R. § 230.424(b) .............................................................................................................. 33

17 C.F.R. § 230.430B ................................................................................................................ 33

17 C.F.R. § 229.504 ................................................................................................................... 28

17 C.F.R. § 229.508 ................................................................................................................... 30

17 C.F.R. § 229.601 ................................................................................................................... 12

17 C.F.R. § 229.1101(c)(1) ....................................................................................................... 15

Fed. R. Civ. P. 8 ......................................................................................................................... 7

Fed. R. Civ. P. 9(b) .................................................................................................................... 7

Fed. R. Civ. P. 12(b)(1) and 12(b)(6) ........................................................................................ 1

The "Underwriter Defendants" are the financial institutions named in paragraph 51 of plaintiffs' May 19, 2009 Consolidated Class Action Complaint ("Complaint" or "Compl.") who served as underwriters of AIG offerings of notes, debentures, and common stock during the March 2006 to September 2008 Class Period.[1]  This memorandum of law is submitted in support of their motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[2]

## PRELIMINARY STATEMENT AND STATEMENT OF FACTS

The Complaint makes extensive allegations of scandal and fraud surrounding American International Group, Inc. ("AIG").  However, when it comes to their claims against the Underwriter Defendants relating to various AIG securities offerings under Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), plaintiffs tactically reverse field.  They frame those claims as narrowly as possible.

Specifically, plaintiffs insist that their Securities Act claims against the Underwriters are predicated on just a handful of the Complaint's factual allegations.  Thus, the Complaint expressly *excludes* from the Securities Act counts all allegations in paragraphs 1-576.  To leave no doubt, plaintiffs state that they "repeat and re-allege the allegations above in ¶¶ 577-606 as they pertain to the Securities Act" and "expressly exclude and disclaim any allegation that

---

[1]   Citations in the form of "Ex. __" refer to exhibits attached to the Declaration of Richard A. Rosen in Support of the Underwriter Defendants' Motion to Dismiss the Consolidated Amended Complaint.

[2]   Plaintiffs have not effected service of process as to Banca IMI S.p.A. or Daiwa Securities SMBC Europe Ltd.  At this juncture, the motion is not being filed on either Banca IMI S.p.A. or Daiwa Securities SMBC Europe Ltd.'s behalf.  Additionally, plaintiffs failed to properly serve Calyon.  The summons is addressed to Calyon's Paris branch, at 9 quai du President Paul Doumer Paris La Defense Cedes 92920 France.  Ex. 25.  However, plaintiffs served Calyon's New York branch, which is not an underwriter and which is not a party to this lawsuit.  Ex. 26.

could be construed as sounding in fraud or intentional or reckless misconduct," and that they "do not incorporate herein any allegations of fraud" in connection with these claims. (Compl. ¶¶ 621, 684.)

Having made the strategic decision to severely restrict their allegations in this manner, the Complaint's charge that the Underwriter Defendants violated Sections 11 and 12(a)(2) must stand or fall on the following discrete set of allegations:

- In paragraph 594, plaintiffs assert that there are four respects in which *additional* disclosures were allegedly required, or were required earlier than the times at which plaintiffs acknowledge they were made, and they allege one misrepresentation. Specifically, plaintiffs allege that AIG's securities offerings failed to disclose certain business decisions relating to credit default swaps and failed to disclose certain terms of those swaps sooner (Compl. ¶¶ 594(a), (c)); plaintiffs allege that AIG failed to disclose a business decision relating to its securities lending program and misstated the collateral required under the lending program (*id.* ¶¶ 594(b), (d)); and plaintiffs allege that AIG failed to disclose the concentration of credit risk to which it was exposed by virtue of its investments of collateral posted to it by customers to whom it had lent securities. (*Id.* ¶ 594(e).)

- In paragraph 597, plaintiffs allege a failure to disclose that certain of the Underwriter Defendants, at undefined times, were counterparties of AIG in unidentified commercial transactions and in unidentified amounts, and therefore might (or might not) receive payments from AIG depending on the results of those transactions. (*Id.* ¶ 597.)

- In paragraphs 598 to 606, the Complaint alleges that the offering documents incorporated fully audited annual financial statements for 2005, 2006 and 2007 that purportedly violated generally accepted accounting principles ("GAAP").[3] (*Id.* ¶¶ 598-606.)

---

[3] The allegations concerning GAAP violations in these audited financial statements are addressed in the motion to dismiss filed by PricewaterhouseCoopers ("PwC"). To avoid duplication, the Underwriter Defendants incorporate PwC's memorandum of law in support of its motion to dismiss ("PwC Br.") on those issues and will not discuss them here. PwC Br. 12-30. Although Plaintiffs also allege in conclusory terms that AIG's Form 10Q for the first quarter of 2008 was false and misleading (Compl. ¶¶ 595-596), the unaudited financial statements in that Form 10-Q are not actionable for the same reasons that the audited financial statements discussed in the PwC brief cannot furnish the basis for a Securities Act claim.

AIG's brief addresses more broadly the sufficiency of AIG's disclosures about the risks and the magnitude of the exposures the company faced in both its securities lending and credit default swap lines of business, and to the extent relevant, those arguments are incorporated herein.   Irrespective of how AIG's own motion is decided, the narrowly confined set of allegations asserted as to the Underwriter Defendants fail to state a claim under the Securities Act because there was simply no duty to disclose the additional information demanded.   Indeed, plaintiffs have not identified any statement of material fact in any prospectus that was rendered misleading by an omission, nor have they alleged any independent duty (based on a statute, regulation, or otherwise) to make disclosures of the type they seek.    And the sole misrepresentation claim asserted against the Underwriter Defendants rests on a mischaracterization of the relevant disclosure. (*See infra* pp. 19-22.)

The Complaint also fails as against the Underwriter Defendants in the following respects:

*Standing*.  Consistent with their overall strategy of severely restricting their claims against the underwriters, plaintiffs conflate and condense more than one hundred separate securities offerings, issued over a twenty-month period, pursuant to nine different prospectuses, each of which bears a different date and incorporates a different set of constantly changing SEC disclosure documents filed by AIG, all issued pursuant to three different shelf registration statements bearing dates as early as 2003 and as late as 2008,[4] and all against a constantly

---

[4]    The June 12, 2003 Shelf Registration Statement covers the following securities, which were offered from October 13, 2006 through July 10, 2007: (1) 5.60% Medium-Term Notes Series G; (2) 5.375% Medium-Term Notes Series MP; (3) Floating Rate Medium-Term Notes Series MP Matched Investment Program; (4) 6.25% Junior A-1 Junior Subordinated Debentures; (5) 5.75% Series A-2 Junior Subordinated Debentures; (6) 4.875% Series A-3 Junior Subordinated Debentures; (7) 4.95% Medium-Term Notes Series MP; (8) Medium-

3

evolving set of market conditions.  It is well settled, however, that plaintiffs lack standing to assert claims with respect to offerings in which no named plaintiff purchased.  Plaintiffs allege that they invested in only twelve of the 101 offerings purportedly covered by the Complaint, and their claims must accordingly be dismissed as to each of the remaining eighty-nine offerings. (*See infra* pp. 31-35.)

> *Statute of Limitations.*   Claims with respect to several offerings, and claims against several underwriters, were not asserted until the filing of the Consolidated Amended Complaint in May 2009, long after the applicable statute of limitations had expired. Additionally, plaintiffs were on actual notice of one of their nondisclosure claims more than one year before the first AIG suit against the Underwriter Defendants was filed, so this claim is time-barred as well. (*See infra* pp. 35-38.)

> *No Damages.*   The sole named plaintiff that allegedly purchased in one of the offerings at issue (5.60% Medium-Term Notes issued Oct. 18, 2006) sold its securities at a profit, and therefore cannot assert a claim with respect to that offering. (*See infra* p. 39.)

---

Term Notes Series MP Floating Rate; (9) 6.45% Series A-4 Junior Subordinated Debentures; (10) 5.45% Medium-Term Notes Series MP (May 15, 2007); (11) 5.45% Medium-Term Notes Series MP (May 25, 2007); and (12) Medium-Term Notes Series AIG-FP-1 through Medium-Term Notes Series AIG-FP-22H, AIG-FP-23, and AIG-FP-24.

The June 22, 2007 Shelf Registration Statement covers the following securities, which were offered from July 18, 2007 through March 3, 2008: (1) 5.450% Medium-Term Notes Series MP (Oct. 4, 2007); (2) 5.85% Medium-Term Notes Series G; (3) 7.70% Series A-5 Junior Subordinated Debentures; and (4) Medium-Term Notes Series AIG-FP-22I, AIG-FP-23A, and AIG-FP-25 through AIG-FP-57A.

The May 12, 2008 Shelf Registration Statement covers the following securities, which were offered on May 12, 2008: (1) 171 Million Shares Common Stock; and (2) 72 Million Equity Units.

For these reasons, the Complaint should be dismissed in its entirety against the Underwriter Defendants.[5]

## ARGUMENT

## I.

## PLAINTIFFS FAIL TO ALLEGE A
## MATERIALLY MISLEADING STATEMENT OR OMISSION

Plaintiffs' Securities Act claims focus on information that AIG purportedly failed to disclose to investors. But the Complaint fails to state a claim under Sections 11 and 12(a)(2) of the Securities Act because it identifies no statements of material fact that were rendered misleading by virtue of those alleged omissions, and because AIG had no duty to disclose the allegedly omitted information. Indeed, in conflating the many dozens of prospectuses involved in the offerings, the Complaint pays virtually no attention to any specific prospectus disclosure at all.

Courts in this Circuit and others routinely dismiss cases under the Securities Act in the absence of a duty to disclose the information in question or a showing that the failure to disclose rendered a prior statement inaccurate. *See, e.g., In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07 Civ. 3994, 2009 WL 464934, at *6-9 (S.D.N.Y. Feb. 25, 2009) (Swain, J.) (dismissing claims under Sections 11 and 12(a)(2) because plaintiffs failed to "plausibly identify any statement in the prospectus that . . . was rendered misleading by any of the alleged omissions"); *In re Morgan Stanley Tech. Fund Sec. Litig.*, No. 02 Civ. 6153, 2009 WL 256005, at *11-13 (S.D.N.Y. Feb. 2, 2009) (Jones, J.) (dismissing claims under Sections 11, 12(a)(2) and

---

[5]   A complete listing of the offerings at issue, as well as the Underwriter Defendants who participated in each offering, can be found at Ex. 20 (offerings listed in Compl. ¶ 591) and Ex. 21 (offerings listed in Compl. ¶ 592).

15 where SEC regulations did not impose duty to disclose nor was disclosure necessary to correct previous misleading statement); *see also J & R Mktg., SEP* v. *Gen. Motors Corp.*, 549 F.3d 384, 394 (6th Cir. 2008) (affirming dismissal of Securities Act claims after finding no duty to disclose all "material, non-public, adverse information"); *Benzon* v. *Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005) (dismissing action where court found that SEC regulations did not create duty to disclose broker compensation arrangements); *Oxford Asset Mgmt., Ltd.* v. *Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002) (dismissing Section 11 and 12(a)(2) action on grounds that "[t]o hold that section 11(a) imposes liability unless the prospectus includes *all* material facts is simply to wholly ignore and render superfluous that section's qualifying language 'required to be stated therein or necessary to make the statements therein not misleading'") (emphasis in original).[6]  Additionally, because plaintiffs have not pled

---

[6]  Numerous additional decisions dismiss Securities Act suits because the court finds no duty to disclose the information at issue. *See, e.g., In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006) (dismissing claims under Section 12(a)(2) where "current law and SEC regulations impose no duty on the defendants" to disclose more than defendants did in the funds' offering prospectuses); *Stonecipher* v. *Lehman ABS Corp.*, No. 04 Civ. 4057, 2006 WL 1458507, at *2 (S.D.N.Y. May 26, 2006) (dismissing Section 11 and 12(a)(2) claims where there was "no duty in law or regulation requiring defendants" to make the disclosures demanded by plaintiff); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208, 2006 WL 1008138, at *8 (S.D.N.Y. Apr. 18, 2006) (dismissing all Securities Act and Exchange Act claims and finding no duty to disclose where SEC Form N1-A did not require disclosure of sales contests, management bonuses, or how differential compensation is allocated); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 586, 589 (S.D.N.Y. 2005) (dismissing Section 11 and 12(a)(2) claims after plaintiffs failed to establish "a material omission that the defendants had a duty to disclose" and independently dismissing the 12(a)(2) claim on standing grounds); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 248-49 (S.D.N.Y. 2003) (dismissing after finding SEC regulations did not impose duty to disclose information at issue); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 699 (S.D.N.Y. 2000) (dismissing Sections 11 and 12(a)(2) claims where "defendants were not under an obligation to disclose that [product's] 'prospects for mass acceptance posed an extreme risk'"); *Geiger* v. *Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1187-88 (S.D.N.Y. 1996) (dismissing Sections 11 and 12(a)(2) claims because defendants not required to disclose allegedly omitted information).

any facts supporting an inference that AIG made false statements in its offering documents, plaintiffs have failed to state a claim under either Section 11 or 12(a)(2) on this theory.[7]

The sections that follow address each of the allegedly misleading statements or omissions identified in the Complaint.[8]

### A.     Plaintiffs Fail to Allege a Misleading Statement or Omission Regarding the Writing of Credit Default Swap Contracts (Compl. ¶ 594(a))

Plaintiffs first allege that the SEC filings incorporated by reference into the registration statements "failed to disclose, until the Second Quarter 2007 10-Q," a decision made in 2005 "to stop writing credit default swap ("CDS") contracts[9] on multi-sector collateralized

---

[7]   *See, e.g.*, *Coronel* v. *Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *23 (S.D.N.Y. Jan. 26, 2009) (dismissing Section 11 and 12(a)(2) claims where plaintiff failed to put forth "sufficient factual allegations" to make it plausible that the offering materials contained any material untruths or omissions); *Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 670 (S.D.N.Y. 2008) (dismissing Section 11 and 12(a)(2) claims where plaintiffs' allegations of material misstatements and omissions were "'reverse-engineered' to attempt to state a claim" and "lack[ed] the [requisite] specificity and detail"); *Miller* v. *Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007) (dismissing Section 11 and 12(a)(2) claims after finding that plaintiffs' "conclusory statements are not adequate to allege an omission or misstatement"); *Schoenhaut* v. *Am. Sensors, Inc.*, 986 F. Supp. 785, 792, 793-95 (S.D.N.Y. 1997) (dismissing Section 11 and 12(a)(2) claims after rejecting plaintiff's accusations of misleading statements and omissions by defendant).

[8]   Plaintiffs' allegations are insufficient under the general pleading standards of Fed. R. Civ. P. Rule 8(a) and this brief addresses all claims under Rule 8. However, because the Section 11 and 12(a)(2) claims sound in fraud, as discussed in the Outside Directors' Brief ("Directors' Br."), plaintiffs must also comply with the heightened pleading requirements of Fed. R. Civ. P. 9(b). Directors' Br. at 1-5.

[9]   Credit default swaps are contracts in which the buyer of the CDS makes a series of payments to the seller and, in exchange, receives a payoff if a credit instrument — typically a bond or loan — goes into default. Often, the contracts would function as insurance on a corporate debt should the underlying obligation fail to pay. (Compl. ¶ 6.)

debt obligations ("CDOs")[10] and even thereafter, failed to disclose the reasons for that decision." (Compl. ¶ 594(a).)  However, they identify no statement that was allegedly rendered misleading by this purported omission, nor do they provide any basis for concluding AIG had an affirmative obligation to disclose this business decision.

Plaintiffs can identify no statement that was rendered misleading because AIG, while making disclosures about its CDS business, had never disclosed the particular types of underlying obligations on which it wrote CDSs before the Second Quarter 2007 10-Q.[11]  It disclosed that its AIGFP subsidiary participated in the credit derivatives market[12] and the size of its credit derivative portfolio for both 2005 and 2006.[13]  It disclosed that there were liquidity risks associated with its CDS business.[14]  It thus informed investors of the extent of AIG's credit derivative exposure and that certain risks were associated with it.  But its disclosures never delineated the particular types of obligations on which it wrote CDSs, or quantified the

---

[10]   Multi-sector collateralized debt obligations, or CDOs, are a type of asset backed security the value of which are derived from varied fixed-income underlying assets.  (Compl. ¶ 8.)

[11]   The Underwriter Defendants incorporate by reference the portions of AIG's memorandum of law that describe the disclosures pertaining to the CDS portion of AIG's business.

[12]   Ex. 1, AIG Form 2005 10-K/A at 128 ("AIGFP enters into credit derivative transactions in the ordinary course of its business."); Ex. 2, AIG Form 2006 10-K at 94 (same).

[13]   Ex. 1, AIG Form 2005 10-K/A at 127-28 ("At December 31, 2005, the notional amount with respect to the Capital Markets credit derivative portfolio (including the super senior transactions) was $387.2 billion."); Ex. 2, AIG Form 2006 10-K, at 95 ("At December 31, 2006, the notional amount with respect to the Capital Markets credit derivative portfolio (including the super senior transactions) was $483.6 billion.").

[14]   Ex. 3, First Quarter 2006 10-Q, at 62 ("If . . . the credit default counterparty failed to perform, AIGFP could have a liquidity strain.  AIG guarantees AIGFP's payment obligations, including its debt obligations."); Ex. 4, Second Quarter 2006 10-Q at 75 (same); Ex. 5, Third Quarter 2006 10-Q at 78 (same).

percentage of each type, and thus did not mislead investors into believing it was writing CDS contracts on multi-sector CDOs when, in fact, it had ceased doing so before the Class Period began.   There is thus no statement that was rendered materially misleading by this alleged omission.

Nor have plaintiffs identified any affirmative obligation to disclose this discrete business decision.  Nothing in any SEC regulation suggests a basis for the disclosures plaintiffs seek.   Item 101 calls for a general description of the registrant's business.[15]   17 C.F.R. § 229.101(c)(1) (registrant must describe "the business done and intended to be done by the registrant and its subsidiaries, focusing upon the registrant's dominant segment or each reportable segment about which financial information is presented in the financial statements").  AIG disclosed its participation in the derivatives market and participation in swaps by its AIGFP subsidiary.  Item 303 provides a list of mandatory disclosures for public offerings dealing with management decisions.  17 C.F.R. § 229.303.   However, under Item 303, "competitive business judgments that management makes to improve the business . . . need not be disclosed."  *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1211 (S.D.N.Y. 1996) (defendants introduced new products and below-market competitive pricing schemes without explicitly detailing them, and although these developments may have affected revenue, the court found that they were not events that the issuer had a duty to disclose).

---

[15]   The required disclosures include "the general development of the business," a description of basic corporate events (such as the corporation's formation, mergers or material changes in the mode of conducting business) and a narrative of the business, focusing upon the registrant's dominant segment or each reportable segment about which financial information is presented in the financial statements. *See* 17 C.F.R. § 229.101.

9

Plaintiffs provide no basis to infer that AIG's decision in 2005 — long before the Class Period even began — to stop writing CDSs on multi-sector CDOs was anything other than a normal business decision by management.  As such, it clearly falls outside the realm of mandatory disclosure. *See also In re Authenticate Holding Corp. Sec. Litig.*, No. 05 Civ 5323, 2009 WL 755360, at *3 (S.D.N.Y. Mar. 23, 2009) (finding no duty to disclose a failure to meet previously undisclosed goals of management); *In re Cosi*, 379 F. Supp. 2d at 587 (defendants have no duty to disclose their consideration of various strategic approaches).  Indeed, because this decision had the effect of *mitigating* the risks associated with writing additional CDSs on the sectors that subsequently suffered the greatest losses during the period when that market was most inflated,  it is unclear how plaintiffs — who only purchased AIG securities in a *later* period — were misled into investing by the absence of such details.  For these reasons, plaintiffs have failed to identify a materially misleading statement or omission with respect to the writing of CDSs on multi-sector CDOs.[16]

### B.    Plaintiffs Fail to Allege a Misleading Statement or Omission Regarding the Valuation of CDOs Underlying AIG CDSs (Compl. ¶ 594(c))

Plaintiffs claim that the registration statements and documents incorporated by reference therein "failed to disclose that the CDS contracts frequently provided that AIGFP's CDS counterparties were the presumptive prevailing party in setting the value of the multi-sector CDOs underlying AIGFP's CDS contracts . . . ."  (Compl. ¶ 594(c).)  This claim is specious.

---

[16]    In any event, given that the Complaint concedes that AIG's 2007 Second Quarter Form 10-Q, filed on August 8, 2007, disclosed the decision to stop writing such CDS contracts, no Securities Act claim can be asserted with respect to any securities offering pursuant to a prospectus or pricing supplement that incorporated the relevant 10-Q after that 10-Q was filed. *See* Ex. 22 (listing these offerings).

In all CDS contracts, one party or the other must initiate the setting of value for collateral call purposes, the other party can accept or challenge that setting, and a mechanism is provided to resolve any disputes. Plaintiffs allege nothing more than that sometimes AIGFP had the right to initiate this process, and sometimes the counterparty had that right.[17] They identify no misleading statement on the subject, and argue without legal basis for disclosure of routine market practices.

CDS contracts are typically subject to standard industry terms and definitions issued by the International Swaps and Derivatives Association ("ISDA"). *See, e.g.*, Mark J.P. Anson, et al., Credit Derivatives: Instruments, Applications, and Pricing 58 (2004) [hereinafter Credit Derivatives] (ISDA Master Agreement "is the authoritative contract used by industry participants"); *id.* at 58-59 (ISDA definitions, e.g. definitions for credit events, are the standard for CDS contracts); Douglas J. Lucas, et al., Collateralized Debt Obligations 222 (2006) ("[ISDA] has created CDS definitions so that market participants have a common language in which to negotiate."). These terms generally provide for a calculation agent and for valuation processes used to set and adjust collateral requirements. "Whenever the Calculation Agent is required to act or to exercise judgment, it will do so in good faith and a commercially reasonable manner." 2003 ISDA Credit Derivatives Definitions § 1.14, at 3-4; *see also* Ex. 27 at 143 (AIG 2008 Form 10-K) (providing that "nearly all of AIG's collateral arrangements for the multi-sector CDOs underlying its CDSs are documented under a Credit Support Annex to an ISDA Master Agreement"). Typically, when a party disagrees with the conclusion of the calculation agent, the ISDA Master Agreement provides that the "disputing party has the right to require that

---

[17] *See* AIG Br. 15-16 for a more detailed discussion.

the determination be made by a disinterested third party that is a dealer of credit derivative instruments." Credit Derivatives, *supra* 67; *see also* AIG Br. 15. Additionally, the calculation agent must consult with the disputing party before picking the disinterested third party. Credit Derivatives, *supra* 67.

Plaintiffs fail to identify any disclosure by AIG that was rendered misleading by AIG's failure to disclose that, in some instances, its counterparty was the calculation agent. They cite no disclosure that misleadingly suggested that AIG was invariably the calculation agent. They cite no uniform industry practice that was violated by having a counterparty play this role; to the contrary, as the ISDA Master Agreement demonstrates, this is a term to be negotiated contract by contract.[18] Nor does the Complaint cite — and we are unaware of — any regulations requiring AIG to have disclosed this detail of its routine contracts. *See, e.g., In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 552 (D. Del. 2002) (finding defendant had no duty to disclose agreements it had with customers in tender offer documents because SEC does not require such disclosure).

Regulation S-K lists in detail certain specific contracts that, when they are financially material, are required to be listed in securities filings and included as exhibits to those filings. 17 C.F.R. § 229.601. That list includes: (i) contracts to which directors, officers,

---

[18] There is no duty to disclose normal industry practices. *See, e.g., In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1417 (9th Cir. 1994) (no duty to disclose in prospectus price protection and stock balancing because these were common practices in relevant industry); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1119 (9th Cir. 1989) (no duty to disclose the fact that buyers could cancel orders at will because "it was well understood within the investment community that computer orders are 'soft'"); *Longden* v. *Sunderman*, 737 F. Supp. 968, 976 (N.D. Tex. 1990) (no duty to disclose where "accounting firm performed no more than normal or traditional services for the offeror").

promoters, voting trustees, named security holders, or underwriters are parties other than contracts involving only the purchase or sale of current assets having a determinable market price, at such market price; (ii) contracts upon which the registrant's business is "substantially dependent"; (iii) contracts calling for the acquisition or sale of property exceeding 15% of fixed assets of the registrant on a consolidated basis; and (iv) material leases. *Id.* The CDS contracts at issue here do not fall into any of these categories.

Where the SEC takes pains to articulate required disclosures in its regulations, there is no duty to make additional disclosures that fall outside the scope of those explicit requirements. *See, e.g., Press* v. *Quick & Reilly, Inc.*, 218 F.3d 121, 131-32 (2d Cir. 2000), (because the SEC already had determined in Rule 10b-10 precisely the information that needed to be disclosed on the subject of broker-dealers' conflicts of interest, the court was "compelled to conclude that additional disclosure, beyond what the fund prospectuses and SAIs reveal is not, as a matter of law, material"); *In re Authentidate Holding Corp. Sec. Litig.*, 2009 WL 755360, at *4 (no duty to disclose a failure to meet revenue metrics because the investors did not allege that "[the] omissions caused any piece of existing 'reported financial information' to misleadingly indicate a specific future result or financial condition," which would have triggered a disclosure obligation under Item 303 of Regulation S-K); *In re Merrill Lynch Research Reports Sec. Litig.*, 272 F. Supp. 2d at 248-49 (rejecting claim of required disclosures for mutual funds when no portion of relevant form called for those disclosures); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *7 (same).[19]

---

[19]  *See also U.S.* v. *Lake*, 472 F.3d 1247, 1258-59 (10th Cir. 2007) (defendant not liable for failure to disclose use of corporate jet where his usage fell below the threshold at which Regulation S-K, Item 402, requires such disclosure); *Resnik* v. *Swartz*, 303 F.3d 147, 152 (2d Cir. 2002) (holding that nothing in Item 402 of Regulation S-K "expressly requires

Plaintiffs have therefore failed to allege the existence of a materially misleading statement or omission relating to which party to CDS contracts initiates the collateral valuation process.

### C.    Plaintiffs Fail to Allege a Misleading Statement or Omission Regarding AIG's Securities Lending Program (Compl. ¶ 594(b))

Plaintiffs allege that AIG violated the Securities Act by failing to disclose two facts about its securities lending program: that in 2005 — well before the first of the offerings at issue here — it had decided to change the mix of assets purchased with the cash collateral it

---

disclosure of the grant-date value of stock options proposed to be provided to the directors," and that defendants' proxy disclosure "plainly meets" the "basic requirement" under this subsection for disclosure of the arrangements for and amounts of directors' compensation); *Vladimir* v. *Bioenvision, Inc.*, 606 F. Supp. 2d 473, 485, 487 (S.D.N.Y. 2009) (finding no duty to disclose where SEC rules did not require disclosure of planned merger transactions); *In re Centerline Holdings Co. Sec. Litig.*, No. 08 Civ. 505, 2009 WL 86850, at *6 (S.D.N.Y. Jan. 12, 2009) ("[E]ven assuming that the statements made by defendants were inaccurate and incomplete . . . the existence of SEC regulations relating to the disclosure of these transactions and defendants' compliance with them suggests that Lead Plaintiff has failed to show defendants acted recklessly in omitting such information."); *J & R Mktg.*, 2007 WL 655291, at *6 (holding that financial services company was not required to disclose financial information about its parent company, which was also its primary source of revenue and noting that, while Regulation S-K mandates that an issuer disclose the identity of certain major customers, it "stops short of requiring that any financial information about those customers be disclosed"); *Stonecipher* v. *Lehman ABS Corp.*, No. 04 Civ. 4057, 2006 WL 1458507, at *2 (S.D.N.Y. May 26, 2006) (issuer of asset-backed securities had no duty to disclose financial information about the issuer of the underlying asset because SEC had determined that such issuers may, under certain circumstances, refer investors to the filings of the underlying securities issuer instead); *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 552 (D. Del. 2002) (finding defendant had no duty to disclose in its tender offer documents agreements that it had with customers, as SEC did not require such disclosure), *aff'd* 357 F.3d 302 (3d Cir. 2004); *Castillo* v. *Dean Witter Discover & Co.*, No. 97 Civ. 1272, 1998 WL 342050, at *9 (S.D.N.Y. June 25, 1998) (declining to impose a duty to disclose internal incentive structures, holding that "[i]f such a duty should exist, it is for the SEC or Congress, not this Court, to create a definition of the extent and nature of such a duty to disclose"); *Geiger*, 933 F. Supp. at 1187-88 (observing that "in the face of detailed requirements" on the subject at issue, the fact that the SEC "does not require disclosure of this fact . . . reflects the SEC's expert view that such disclosure is not required").

received; and that, until its 2007 10-K, it did not disclose the resulting concentration of those assets. (Compl. ¶¶ 594(b), 627.) These allegations fail to state a claim because plaintiffs identify no statement that was rendered misleading by the alleged omissions, and no basis for concluding that AIG was obligated to disclose this ordinary business decision.

> Plaintiffs allege, with respect to AIG's securities lending program, that:
>
> [I]n or about December 2005, [AIG employees] Neuger and McGinn signed off on a proposal to invest 75 percent of the cash collateral in asset-backed securities, including securities that were backed by subprime mortgages and credit card debt . . . . While this served for a while to increase profits of AIG Investments (and the parent company, AIG), it also placed AIG and its investment unit in a precarious position, since the securities lending division was obligated to repay or roll over most of its loans every 30 days, but much of the subprime debt investments matured in two to five years.[20]

(Compl. ¶ 245, incorporated by reference in *id.* ¶ 594(b).) They allege that the failure to disclose this business decision, and the subsequent "concentration of investments in RMBS [residential mortgage-backed securities] and other ABS [asset-backed securities] that was made through the securities lending program," materially misled investors. (*Id.* ¶ 594(b).)[21]

---

[20] An "asset-backed security" is a "security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period, plus any rights or other assets designed to assure the servicing or timely distributions of proceeds to the security holders . . ." whose cash flows come from a pool of underlying assets such as credit cards or auto loans. 17 C.F.R. § 229.1101(c)(1). Mortgage-backed securities, including RMBS, are "the largest and most developed asset-backed securities market." Talcott J. Franklin & Thomas F. Nealon, Mortgage and Asset Backed Scurities Litigation Handbook § 1.1 (2008).

[21] Plaintiffs do not allege that AIG in fact ever invested as much as 75% of its securities lending collateral in RMBS and other ABS, and AIG's disclosures indicate that it did not. Those disclosures, the accuracy of which plaintiffs do not challenge, show that the concentration of the securities lending collateral invested in mortgage-backed, asset-backed and collateralized securities was 65.44% in 2007 (Ex. 6 at 108 (2007 Form 10-K)), 63.70% in the first quarter or 2008 (Ex. 7 at 95 (2008 First Quarter Form 10-Q)), and 60.78% in the second quarter of 2008 (Ex. 8 at 111 (2008 Second Quarter Form 10-Q)).

Plaintiffs make no attempt to identify any particular disclosure by AIG that was rendered misleading by this alleged omission. AIG consistently disclosed the existence of the securities lending program, the fair value of the collateral it received from securities borrowers, and any shortfall in the value of its investments of collateral relative to the amount it had received from securities borrowers.[22] It disclosed that AIG's insurance and asset management operations invested securities lending collateral primarily in floating rate debt securities, a category that includes (but is not limited to) ABS and RMBS.[23] Because AIG did not disclose the particular allocation of collateral investments among different classes of debt securities until early 2008, plaintiffs cannot allege that AIG made a misleading statement on this subject.

Nor do plaintiffs identify any basis for concluding that AIG was affirmatively obligated to disclose this allocation (or the business decision that allegedly underlay it). The SEC regulation that governs Management's Discussion and Analysis — the relevant section of

---

[22] *Compare* disclosures regarding Securities Lending Payable, e.g., Exs. 1 at 72 (2005 Form 10-K/A); 3 at 2 (2006 First Quarter Form 10-Q); 4 at 2 (2006 Second Quarter Form 10-Q; 5 at 2 (2006 First Quarter Form 10-Q); 2 at 103 (2006 Form 10-K); 9 at 2 (2007 First Quarter Form 10-Q); 10 at 2 (2007 Second Quarter Form 10-Q); 11 at 2 (2007 Third Quarter Form 10-Q); 6 at 131 (2007 Form 10-K); 7 at 2 (2008 First Quarter Form 10-Q); 8 at 2 (2008 Second Quarter Form 10-Q) *with* disclosures regarding Securities Lending Collateral, e.g., Exs. 1 at 71 (2005 Form 10-K/A); 3 at 1 (2006 First Quarter Form 10-Q); 2 at 102 (2006 Form 10-K); 9 at 1 (2007 First Quarter Form 10-Q); 10 at 1 (2007 Second Quarter Form 10-Q); 11 at 1 (2007 Third Quarter Form 10-Q); 6 at 130 (2007 Form 10-K); 7 at 1 (2008 First Quarter Form 10-Q); 8 at 1 (2008 Second Quarter Form 10-Q).

[23] *See* Exs. 1 at 82 (2005 Form 10-K); 2 at 114 (2006 Form 10-K). *See generally* The Handbook of Fixed Income Securities 590-91 (Frank J. Fabozzi, ed., 7th ed. 2005) (noting that the mortgage-related bond market is the largest segment of the U.S. fixed income markets); Moorad Choudhry, Corporate Bonds and Structured Financial Products 100-01 (2004) (asset-backed bonds are "bundled securities . . . that result from the bundling or packing together a set of non-marketable assets . . . [which] is know as securitisation"); *id.* at 311 (identifying mortgage-backed securities as the "largest of the asset-backed bond markets").

AIG's filings — contains no such requirement of breakdowns at that level of detail.  *See* 17 C.F.R. § 229.303(a).  That regulation calls for information "that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations," as well as information regarding "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."  *Id.*  There are no facts set forth in the relevant paragraphs of the Complaint that would support a conclusion that, as of the filings of AIG's 2005 or 2006 Form 10-Ks, AIG's management believed that a detailed breakdown of its securities lending floating rate debt security investments was necessary to an understanding of its business, or that its choice among types of floating rate debt securities was reasonably likely materially to affect its liquidity.

Moreover, the courts have consistently held that business decisions at this level of specificity — or the disaggregation of detailed investment information of the sort that plaintiffs would require — are *not* required to be disclosed.  *See, e.g.*, *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) (finding no obligation to break out costs for broker commissions where plaintiffs could "point to no accounting or reporting requirements which would require [such] disaggregation"); *In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 479 (E.D.N.Y. 2006) (holding that additional disclosure was not required where "it is apparent from the quarterly reports disclosed to the public that the company was heavily involved in investing in mortgage-backed securities") (internal citation omitted); *In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 266 (E.D.N.Y. 2002) (dismissing securities claims dependent on an alleged failure to provide details of hedging activity where there was "no regulation requiring more detailed disclosure" of such activity); *In re Canandaigua Sec. Litig.*,

17

944 F. Supp. at 1209-11 (holding that in the absence of any misleading prior disclosures, defendant had no obligation to disclose business strategies and pricing decisions).[24]

The fact that AIG elected to disclose this detailed information in its 2007 10-K, when the worldwide financial meltdown had commenced and the market for ABS and RMBS was under stress, as detailed in the brief of defendant AIG, is not a basis for concluding that similar detail was legally required in *earlier* filings.  Plaintiffs allege no facts supporting an inference that these investments had, before late 2007, given rise to material liquidity problems or that, in management's judgment, they were likely to do so.  Rather, plaintiffs rely on the assumption, thoroughly rejected by the courts, that "statements in one report should have been made in earlier reports."  *Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995); *see also Panther Partners*, 538 F. Supp. 2d at 673 ("Plaintiff asks the Court to assume that Defendants *must* have known because something did in fact occur later; this is simply inadequate pleading.") (emphasis in original); *Scibelli* v. *Roth*, No. 98 Civ. 7228, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000) (holding that later disclosure is not a sufficient basis for inferring earlier knowledge).  Plaintiffs have thus failed to plead any factual basis for concluding that AIG was required, during the Class Period, to disclose its earlier business decisions regarding the mix of assets in which it would invest the securities lending collateral it held.[25]

---

[24]  *See also San Leandro Emergency Med. Group Profit Sharing Plan* v. *Phillip Morris Cos., Inc.*, 75 F.3d 801, 810 (2d. Cir. 1996) (holding that defendant was not obligated to disclose an alternative marketing plan where Plaintiffs failed to adequately plead a duty to disclose the information); *Vladimir*, 606 F. Supp. 2d at 485, 487 (finding no duty to disclose a planned merger transaction where SEC rules did not specifically require disclosure); *In re Authenticate Holding Corp. Sec. Litig.*, 2009 WL 755360, at *3 (finding no duty to disclose failure to meet revenue metrics where plaintiffs failed to plead "sufficient factual allegations that would plausibly demonstrate the existence of a duty to disclose" such information).

[25]  In any event, inasmuch as the Complaint concedes that the concentration of investments of collateral *was* disclosed in AIG's 2007 Form 10-K on February 28, 2007, no viable Securities

**D.**      **Plaintiffs Fail to Allege a Misleading Statement or Omission Regarding the Cash Collateral Requirement in the Securities Lending Program (Compl. ¶ 594(d))**

Plaintiffs allege that AIG misrepresented the percentage of the value of loaned securities that AIG required borrowers to post as cash collateral in its securities lending program. They contend that AIG's 2007 Form 10-K was inaccurate and that the inaccuracy was corrected in AIG's 2008 Second Quarter 10-Q (Compl. ¶ 594(d), incorporating *id.* ¶ 209). However, plaintiffs fail to allege facts supporting their inference that any of AIG's statements on this subject were false or misleading at any time.

To begin with, plaintiffs identify no statements on this point *prior to* AIG's 2007 Form 10-K and the Underwriter Defendants are aware of none.   In fact, prior to the dissemination of AIG's 2007 Form 10-K, AIG's disclosures were silent as to the percentage of collateral required, stating:

> AIG's insurance and asset management operations lend their securities and primarily take cash as collateral with respect to the securities lent.  Invested collateral consists primarily of floating rate bonds.  Income earned on invested collateral, net of interest payable to the collateral provider, is recorded in net investment income.

Ex. 2 at 114 (2006 Form 10-K); *see also* Ex. 1 at 81 (2005 Form 10-K/A) (same).

Moreover, AIG made no statement on this subject in any of the Forms 10-Q filed in the course of 2007.[26]  Accordingly, inasmuch as the Complaint does not — and could not —

---

Act claim can be asserted based on this omission with respect to the securities offerings that were effected based on prospectuses that incorporated the 2007 10-K, namely: the May 12, 2008 Prospectus Supplements (covering, respectively, the offerings of 171,052,631 shares of common stock and seventy-two million equity units), and Medium-Term Notes Series AIG-FP-55A and AIG-FP-57A.

[26]   *See, e.g.,* Exs. 9 at 1, 2, 5, 49, 66, 67 (2007 First Quarter Form 10-Q); 10 at 1, 2, 5, 59, 79, 80 (2007 Second Quarter Form 10-Q); 11 at 1, 2, 5, 63, 83, 85, 86, 87, 88 (2007 Third Quarter Form 10-Q).

allege that AIG had an affirmative duty to disclose the percentage of the value of loaned securities required as cash collateral, no viable Securities Act claims based on the subject can be asserted with respect to any securities offering that was effected *prior to* the issuance of AIG's Form 2007 10-K in February 2008.

AIG's 2007 Form 10-K was the very first AIG disclosure document to describe a percentage of cash collateral required, stating:

> AIG's securities lending program is a centrally managed program facilitated by AIG Investments primarily for the benefit of certain of AIG's Insurance companies.  Securities are loaned to various financial institutions, primarily major banks and brokerage firms. *Cash collateral equal to 102 percent of the fair value of the loaned securities is received.*

Ex. 6 at 108 (2007 Form 10-K) (emphasis added).  Plaintiffs contend that this 102 percent figure must have been misleading, because AIG's 10-Q for the first quarter of 2008 stated that "[c]ash collateral *generally* equal to 102 percent of the fair value of the loaned securities is received" (Ex. 7 at 93-94 (2008 First Quarter Form 10-Q) (emphasis added)), and because AIG's 10-Q for the second quarter of 2008 stated:

> Cash collateral generally ranging from 100 to 102 percent of the fair value of the loaned securities is received and is invested in fixed maturity securities to earn a net spread.  To the extent that the collateral received is less than 102 percent, AIG has agreed with its insurance companies to deposit funds to the collateral pool for the benefit of the insurance company participants.

Ex. 8 at 111 (2008 Second Quarter Form 10-Q).  Thus, plaintiffs' claim boils down to the assertion that AIG *must have been* receiving cash collateral of 100 to 102 percent of the fair value of loaned securities during the period covered by the 2007 Form 10-K and that it was

materially misleading to cite the 102 percent figure in that document.[27] *Cf. Rubin* v. *MF Global, Ltd.*, __ F. Supp. 2d __, No. 08 Civ. 2233, 2009 WL 2058590, at \*7 (S.D.N.Y. July 16, 2009) ("The Court finds that the statements described above are not false or misleading because although the Prospectus states the MF Global 'generally do[es] not . . . take positions for [its] own account,' this statement does not foreclose the possibility that MF Global will sometimes take positions for its own account.").

Plaintiffs' conclusion that the 2007 Form 10-K was materially misleading fails for three reasons. *First*, it assumes — without supporting factual allegations — that the underlying facts remained unchanged. That is, the Complaint alleges no facts showing that AIG was receiving *less* than 102 percent cash collateral in 2007 and that the statement in the 2007 Form 10-K was therefore inaccurate in any respect. A plaintiff cannot simply assume that a description of an earlier policy is inaccurate because a later description — based on later circumstances — differs. *See Good Hill Partners L.P.* v. *WM Asset Holdings Corp. CI 2007-WM2*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008) (rejecting plaintiff's assertion that a subsequently disclosed policy was proof the policy had been adopted at the time of an earlier offering); *see also Coronel* v. *Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at \*13, \*23 (S.D.N.Y. Jan. 26, 2009) (dismissing securities claims dependent on subsequent disclosures and noting: "The relevant inquiry under the Securities Act is not whether the estimate in the offering documents later turned out to be correct, but rather whether the facts

---

[27] Inasmuch as the Complaint does not challenge the accuracy of AIG's 2008 First Quarter Form 10-Q on this subject, the securities offerings effected after the date that this Form 10-Q was filed cannot be attacked on this ground under the Securities Act, namely: (i) the offering of 171,052,631 shares of common stock and (ii) the offering of seventy-two million equity units under the May 12, 2008 Shelf Registration Statement and the accompanying May 12, 2008 Prospectus Supplements.

alleged in the Complaint evince that the [Defendant] knew or had reason to believe, at the time the Prospectus and Registration Statement were filed, that the statement was untrue.").

       *Second*, plaintiffs ignore AIG's disclosure, throughout the relevant period, of detailed information concerning the value of the cash collateral AIG had received in its securities lending business. In each of its Forms 10-K and 10-Q, AIG disclosed the fair value of the cash collateral that AIG had reinvested *and compared it to the amount of cash collateral it owed back to the borrowers*.[28] Thus, investors had access to even more meaningful and precise information — which plaintiffs do not claim was misleading in any respect — regarding the relationship between the value of the securities AIG had lent and the value of the cash collateral investments it held. *Cf. In re Worlds of Wonder*, 35 F.3d at 1419 (holding that where underlying sales data was adequately disclosed, Defendants were not required to disclose the "ramifications of [a] drop in sales").

       *Third*, the difference between a collateral requirement of 102 percent and of "100 to 102 percent" is immaterial as a matter of law. At year-end 2007, AIG's securities lending payable was approximately $81.97 billion. Two percent of this — the difference between 100 and 102 percent — is approximately $1.64 billion. Compared to AIG's total liabilities of $964.604 billion, this amounts to 0.17%. This difference is plainly immaterial. *See Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613-14 (S.D.N.Y. 2008) (finding fees making up 0.4% of a company's annual revenue "simply too small to be material as a matter of law"); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 630-31 (S.D.N.Y. 2005) (finding a change in

---

[28] *See* Exs. 1 at 71-72 (2005 Form 10-K/A); 2 at 102-03 (2006 Form 10-K); 6 at 130-31 (2007 Form 10-K); 7 at 1-2 (2008 First Quarter Form 10-Q).

accounting treatment representing 0.3% of Defendant's total assets to be immaterial as matter of law).

E.  **Plaintiffs Fail to Allege a Misleading Statement or Omission Regarding AIG's Concentration of Credit Risk in the Subprime Market (Compl. ¶ 594(e))**

Plaintiffs allege that AIG's 2005 and 2006 financial statements failed adequately to set forth AIG's concentration of credit risk attributable to the investment of its securities lending portfolio in the U.S. residential housing and mortgage market, including the subprime market. (Compl. ¶ 594(e), incorporating *id.* ¶ 434.) Plaintiffs invoke an accounting rule, Financial Accounting Standards Board, Statement of Financial Accounting Standards ("SFAS") No. 107 ¶ 15A, to support this claim. Although the Underwriter Defendants rely on the response of PwC on this accounting point,[29] it is worth highlighting the fundamental issue: plaintiffs' suggestion in paragraph 434 of their Complaint that SFAS No. 107 ¶ 15A required AIG to make a distinct and separate disclosure of its securities lending credit exposure is dead wrong. SFAS No. 107 ¶ 15A concerns the disclosure of significant *credit risk to a counterparty*. SFAS No. 107 ¶ 15A does not apply to AIG's securities lending investments in the mortgage markets, which are not subject to credit risk from a counterparty. Instead, these investments were subject to a *market risk* associated with the mortgage market. SFAS 107 No. ¶ 15C specifically provides that "[a]n entity is encouraged, *but not required, to disclose quantitative information about the market risks of financial instruments*, that is consistent with the way it manages or adjusts those risks." (Emphasis added.)

Far from requiring a company to disaggregate its assets in financial disclosures, the accounting rules specifically permit and contemplate that companies will disclose classes of

---

[29]  PwC Br. 19-21, 23.

assets, liabilities, and total-balance-sheet risk, rather than specific holdings. *See* SFAS No. 115 ¶ 19 (requiring disclosure of "aggregate fair value" of financial instruments by "major security type").

Moreover, although in the current environment class action plaintiffs commonly fault financial firms for not breaking out their subprime exposure, such a break-out was discouraged during the period in question. As the Fourth Circuit explained, in rejecting a claim that a defendant should have disclosed the size of its subprime portfolio:

> [S]ubprime lenders are discouraged from publicly reporting the size of their subprime portfolios because there is no standard industry-wide approach to the definitions of either "subprime" or "program," which means that the meanings of these terms are institution-specific. Thus, the reported information will not be entirely comparable from one institution to the next, leading to potential misinterpretation of the data by the public.

*Nolte* v. *Capital One Fin. Corp.*, 390 F.3d 311, 317 (4th Cir. 2004) (internal citation and some quotation marks omitted).[30]

## II.

## AIG HAD NO DUTY TO DISCLOSE THAT CERTAIN OF THE UNDERWRITERS OF AIG SECURITIES WERE ALSO COUNTERPARTIES OF AIG WITH RESPECT TO THE CDS PORTFOLIO AND SECURITIES LENDING PROGRAM

The Complaint alleges that AIG had a duty to disclose that a number of the financial institutions that served as underwriters of one or more securities offerings were also

---

[30] In any event, inasmuch as the Complaint concedes that the concentration of investments of collateral *was* disclosed in AIG's 2007 10-K, no viable Securities Act claim can be asserted based on this omission with respect to the securities offerings that were effected based on prospectuses that incorporated the 2007 10-K, namely: the May 12, 2008 Prospectus Supplements (covering, respectively, the offerings of 171 million shares of common stock and $72,000,000 in equity units, B-1, B-2, and B-3 junior subordinated debentures), and Medium-Term Notes Series AIG-FP-55A and AIG-FP-57A.

counterparties in various commercial transactions in which AIG had engaged and thus that it was possible that funds raised in the offering could be used to make payments to those counterparties.

By virtue of disclosures contained in *every* registration statement, investors in AIG securities were on notice that the underwriters of those securities might engage, from time to time, in transactions with AIG.   The following express disclosure appears in the base prospectuses included in the Shelf Registration Statements dated June 12, 2003 and June 22, 2007, which are incorporated by reference in the Shelf Registration Statement dated May 12, 2008:

> Underwriters, dealers or agents may engage in transactions with, or perform services for, us or subsidiaries of AIG in the ordinary course of business.[31]

Plaintiffs' nondisclosure claim is thus untenable as a matter of law because AIG and the underwriters complied with the relevant disclosure obligations imposed by SEC rules; they were required to do no more.

The Complaint makes no reference to AIG's straightforward disclosure on the subject of its potential transactions with underwriters.   Instead, plaintiffs posit in blunderbuss fashion that all offering materials violated the Securities Act because they

> failed to disclose the material fact that many of the Underwriters of securities and notes issued by AIG during the Class Period were also counterparties of AIG with respect to its CDS portfolio and securities lending program, and therefore, that significant portions of the sums raised through the Offerings by the Underwriters would or could be used to post collateral for the benefit of the Underwriters, or to make payments to the Underwriters.

---

[31]   Ex. 13 at 61 (Debt Securities Prospectus); *id.* at 41 (Capital Securities Prospectus); Ex. 14 at 105 (Debt Securities Prospectus); *id.* at 44 (Capital Securities Prospectus); Ex. 15 at 1 ("In accordance with Rule 462(b), this registration statement incorporates by reference the contents of the Registration Statements on Form S-3 . . . including all amendments, supplements and exhibits thereto.").

(Compl. ¶ 597.)[32]

Although financial service firms such as the underwriters engage in many types of transactions with public company clients, in addition to the underwriting of their securities offerings, the Underwriter Defendants are aware of no judicial decisions that hold that issuers and underwriters are required to provide details concerning the nature and/or magnitude of ordinary commercial transactions — unrelated to the offering itself — in which they may from time to time engage.

The plaintiffs appear to recognize — as they must — that the mere existence of commercial relationships or transactions in the ordinary course of AIG's business with large Wall Street firms cannot, standing alone, trigger any disclosure obligation.   Instead, the Complaint predicates its theory on the ostensibly narrower premise that disclosure was required here because "significant portions" of the proceeds of the offerings "would or could" be used to post collateral for the benefit of, or to make payments of some unspecified kind at some unspecified time in the future to, one or more underwriters.   There are several reasons why this contention — which finds no support in any regulation or any court decision — is without merit.

To begin with, the very limited case law in this area indicates that ordinary commercial dealings (and the fact that those could result in payments to an underwriter in its capacity as a counterparty) need not be disclosed, but, that instead, "[i]nformation regarding relationships that undermine the independence of an underwriter's judgment about the quality of

---

[32]   Plaintiffs allege facts to suggest that only the following banks engaged in counterparty relationships:  Bank of America, BMO, BNP, Barclays, Calyon, Citigroup, Deutsche Bank, Goldman Sachs, HSBC, Merrill Lynch, Société Générale, and UBS.  (*See* Compl. ¶ 597.) Thus, only prospectus disclosures for securities offerings underwritten by one or more of these underwriters are at issue for this claim.  *See* Ex. 23 for a list of the relevant offerings.

the investment can be material to an investor." *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 689-90 (S.D.N.Y. 2004) (bankers' dual roles as analysts and underwriters, along with executive's "extraordinary financial relationships" with underwriters could be material); *Degulis* v. *LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1314 (S.D.N.Y. 1996) (failure to disclose that market price would be dependent on underwriter as market maker and that underwriter was in poor financial condition is material); *SEC* v. *Scott*, 565 F. Supp. 1513, 1527 (S.D.N.Y. 1983) (kickback agreement between the issuer and the underwriter material).

Indeed, Judge Cote made clear in *WorldCom* that ordinary commercial activity between an executive of an issuer and its underwriter need *not* be disclosed. 346 F. Supp. 2d at 690 n.57. Significantly, in response to the defendants' concern that the court's holding would "require disclosure in every underwriting of home mortgages, student loans, and checking and savings accounts," Judge Cote stated that her opinion "should *not* be read as indicating that there is a duty to disclose an executive's ordinary banking arrangements and relationships." *Id.* (emphasis added). Instead, the court held that the specific unusual relationships at issue in *Worldcom* raised questions of fact. *Id.*

Second, money is fungible. Plaintiffs do not contend (and cannot allege) that any offering was effected for the sole or even primary purpose of defraying financial obligations to any underwriter, or that AIG, at the time of any offering that is the subject of this lawsuit, had insufficient funds to make whatever payments might come due in the ordinary course of its business, or that there were large debts owed to any given underwriter at the time of an offering.

Third, plaintiffs do not and cannot allege that the credit default swap and securities lending transactions in which one or another underwriter was AIG's counterparty were likely (let alone inevitably) going to require payments to the underwriter. By their nature, these

27

are transactions in which each party bears risk and each party may, at the end of the day, be owed money by the other, depending on the way the relevant markets move. Indeed, plaintiffs implicitly recognize this and hedge their bets by alleging that the outstanding transactions "could" result in payments by AIG — but also might not. The inherent uncertainty of the outcome of such transactions underscores the more general point that plaintiffs allege no relationship between the commercial arm's length transactions into which AIG was routinely entering and the securities offerings being underwritten by one or another financial institution. Certainly, the Complaint does not allege that the decision-making by any Underwriter Defendant was affected or influenced by the terms or magnitude of any outstanding transactions with AIG or its affiliates.

Fourth, the offering documents all say, with strict accuracy, that the funds raised in each offering will be used, *inter alia*, for general corporate purposes.[33] Payments to counterparties in connection with routine commercial dealings fall well within this definition. This disclosure was accurate and there was no duty to supply further details. Thus, Item 504 of Regulation S-K governs the "use of proceeds" section in a registration statement or prospectus. Item 504 does not require companies to provide details of proposed expenditures and provides that an issuer may indicate that it has no "current specific plan for the proceeds." 17 C.F.R. § 229.504.

---

[33] *See*, *e.g.*, Exs. 13 at 4 (June 12, 2003 Shelf Registration Statement) ("Unless otherwise indicated in any prospectus supplement, we intend to use the net proceeds from the sale of securities for general corporate purposes."); 14 at 5 (June 22, 2007 Shelf Registration Statement) ("Unless otherwise indicated in any prospectus supplement, AIG intends to use the net proceeds from the sale of securities for general corporate purposes and AIGFP intends to loan the net proceeds from the sale of securities to AIG, its direct parent, or certain of AIG's subsidiaries, for application to general corporate purposes."); 15 at 1 (May 12, 2008 Shelf Registration Statement) (incorporating by reference earlier registration statements).

The courts have repeatedly held that it is proper for an issuer to state that it intends to use the proceeds for "general corporate purposes" and that this is a capacious term that properly covers a wide range of activities and uses. Courts have not hesitated to dismiss complaints under the securities laws that are premised on the theory that each specific use of funds must be identified.[34]

Fifth, plaintiffs' contention that AIG had a duty to disclose details of the transactions with one or more underwriters suffers from an additional, very telling, flaw — the scope and extent of the purported duty to disclose is amorphous and indeterminate, leaving open many more questions than it answers. Which types of transactions need to be disclosed? What level of detail needs to be provided about the transactions? How likely do the potential payments to the underwriters have to be before the disclosure duty is triggered? How large do the potential payments have to be? Does the disclosure duty depend on whether the transactions are currently outstanding or does it apply to completed past transactions of a certain magnitude? What about potential future transactions?

---

[34] See, *e.g.*, *Halperin* v. *eBanker USA.com, Inc.*, 40 F. App. 624, 626 (2d Cir. 2002) (rejecting plaintiffs' claim that offering memorandum misrepresented use of proceeds and finding that making investments with other companies falls within the definition of "working capital and general corporate purposes"); *In re Novagold Res. Inc. Sec. Litig.*, __ F. Supp. 2d __, 2009 WL 1575220, at *20 (S.D.N.Y. 2009) (dismissing Securities Act claims and holding that funding of feasibility study fell within general corporate purpose authorized by use of proceeds section in prospectus); *In re N.Y. Cmty. Bancorp*, 448 F. Supp. 2d at 466, 482 (where "the company states that the funds will be used for 'general corporate purposes,' the term is broad enough to encompass a number of different items."); *In re WorldCom Sec. Litig.*, 346 F. Supp. 2d at 696 (holding that company's use of proceeds to fund negative cash flow did not render false statement in prospectus supplement that proceeds would be used for general corporate purposes); *DeMaria* v. *Andersen*, 153 F. Supp. 2d 300, 313 (S.D.N.Y. 2001) (finding that company's use of IPO proceeds in part to repay losses did not render false statement in prospectus that proceeds from IPO would be used primarily as working capital because company retained broad discretion in how the proceeds would be used and "a function of working capital is to fund operations").

Even this short list of questions makes clear that the disclosure obligation for which plaintiffs argue is amorphous in the extreme. *See*, *e.g.*, *Castillo*, 1998 WL 342050, at \*9 (holding that imposing a duty on funds to disclose differential commissions "would engender an almost impossible problem of defining the limits of such a duty," and that "it is for the SEC or Congress, not this Court, to create a definition of the extent and nature of such a duty to disclose").

Finally, it is well settled that "[t]he primary function of a registration statement is to disclose information about the issuer, not its underwriters." *In re WorldCom, Inc. Sec. Litig*, 346 F. Supp. 2d at 688. The limited information about underwriters that must be disclosed in a registration statement or prospectus is set forth in Item 508 of Regulation S-K, which deals with the plan of distribution of securities. 17 C.F.R. § 229.508. Item 508 provides that the prospectus should identify the "principal underwriters" and identify "each such underwriter having a material relationship with the registrant and state the nature of that relationship." 17 C.F.R. § 229.508(a). Item 508 goes on to list a series of much more specific disclosure obligations, which include a description of the nature of the underwriter's obligation to take securities; the underwriter's compensation; the existence of any underwriter's representatives on the issuer's board of directors; any indemnity provided to the underwriter and the identification of any principal underwriter that intends to sell to any accounts over which it has discretionary authority, along with an estimate of the amount of securities so intended to be sold. 17 C.F.R. § 229.508(a)-(l).

Nothing in Item 508 directs the issuer to delineate and quantify all transactions unrelated to the offering in which an underwriter may be a participant. In particular, although the SEC requires underwriters to provide specific and quantitative details concerning

transactions involving the offering itself — namely, the prospective sale of securities in the offering to discretionary accounts — no such detailed information is required about transactions unrelated to the offering. (See cases cited *supra* p. 15 and note 19.)  Such a new disclosure obligation should not be imposed by judicial decision long after the fact, but — if it is to be adopted at all — should be the subject of the SEC rule-making process.

### III.

### PLAINTIFFS LACK STANDING TO ASSERT CLAIMS ARISING FROM CERTAIN OFFERINGS LISTED IN THE COMPLAINT

Plaintiffs purport to bring their Section 11 and Section 12 claims "on behalf of all Class members who purchased or acquired AIG securities in or traceable to the equity and debt offerings" identified in the Complaint. (Compl. ¶ 623.)  But no lead plaintiff or named plaintiff purchased eighty-nine of the 101 securities offerings at issue in this lawsuit, including forty-six of the offerings pursuant to the June 12, 2003 Shelf Registration Statement and forty-three of the offerings sold pursuant to the June 22, 2007 Shelf Registration Statement.[35]  Plaintiffs thus do not have standing to bring a claim under Section 11 or Section 12 as to those offerings. *See Hoffman* v. *UBS-AG*, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008) (plaintiffs cannot meet the injury requirement for standing when they have not personally invested in an offering "because they cannot claim to be personally injured by the violations relating to those funds").

In *In re Authentidate Holding Corp. Sec. Litig.*, No. 05 Civ. 5323, 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006) (Swain, J.), this Court specifically held that there must

---

[35]  The offerings are identified in paragraphs 591-592 of the Complaint.  Exhibit 1 to the Complaint lists all those securities that a named plaintiff actually purchased.  A complete list of offerings for which there is no plaintiff purchaser is set out in Ex. 24.

be a named plaintiff who purchased shares of stock that are traceable to each offering and that only such a plaintiff has standing to represent each potential subclass of purchasers. This Court relied upon, and quoted with approval, Judge Lynch's decision in *In re Global Crossing, Ltd. Securities Litigation*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003), that, to have standing to assert a Securities Act claim on behalf of a class, "a named plaintiff must have purchased shares traceable to the challenged offering." For the same proposition, this Court also quoted with approval *In re Initial Public Offering Securities Litigation*, 214 F.R.D. 117, 122 (S.D.N.Y. 2002) (holding that "[i]n order to maintain a class action, plaintiffs must first establish that they have a valid claim with respect to the shares that they purchased. If the *named* plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim.") and *In re WorldCom, Inc. Securities Litigation*, 294 F. Supp. 2d 392, 422 (S.D.N.Y. 2003) (denying a motion to dismiss Section 11 claims in part because "[i]n filing the Complaint, [PSLRA] lead plaintiff fulfilled its obligation to assess the causes of action available to the class, to plead those claims in the consolidated amended complaint, and to identify as named plaintiffs any additional class representatives that were necessary to assert the claims").[36]

        Plaintiffs cannot cure their lack of standing by relying on the fact that many of the offerings in which no named plaintiff invested were predicated on the same shelf registration statements as other offerings that *were* purchased by a named plaintiff. Under governing SEC

---

[36] *Accord*, *e.g.*, *Ong* v. *Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 891-92 (N.D. Ill. 2004) (holding that named plaintiffs had standing to pursue claims only as to the offerings in which they invested and dismissing from the case the claims as to the other offerings); *In re Paracelsus Corp. Sec. Litig.*, 6 F. Supp. 2d 626, 631 (S.D. Tex. 1998) (holding that "a plaintiff bringing suit under either Section 11 or Section 12 of the Securities Act at least must allege that he or she purchased or acquired the security at issue").

rules, each new issuance of securities pursuant to a shelf offering requires the filing of a

prospectus supplement or pricing supplement with the SEC that sets forth any information (such

as the price) that is not included in the underlying registration statement or base prospectus,

pursuant to Rule 424(b) under the Securities Act, 17 C.F.R. § 230.424(b).  Pursuant to Rule 430B,

17 C.F.R. § 230.430B, the date on which a prospectus supplement or pricing supplement is filed

pursuant to Rule 424(b)

> shall be deemed, for purposes of liability under section 11 of the
> Act of the issuer and any underwriter at the time only, to be a new
> effective date of the part of such registration statement relating to
> the securities to which such form of prospectus relates . . . .  The
> offering of such securities at that time shall be deemed to be the
> initial *bona fide* offering thereof.

Consistent with this SEC rule, plaintiffs concede that "the 'effective date' of each of the

registration statements is the date of the relevant Offering" and not the date on which each shelf

registration statement was filed. (Compl. ¶ 593.)

      *In re Friedman's, Inc. Securities Litigation*, 385 F. Supp. 2d 1345, 1371 (N.D.

Ga. 2005) is right on point.  *Friedman's* held that the fact that two offerings arose from the same

shelf registration statement was not sufficient to confer standing on plaintiffs who had purchased

in one of the offerings to sue as to the other offering.  The court noted that the offerings had

different prospectuses and different underwriters.  *Id.*

      *Hoffman* v. *UBS-AG*, 591 F. Supp. 2d at 530-32 is also instructive.   Plaintiffs

there alleged various disclosure violations in the prospectus for twenty-one mutual funds.  The

court held that plaintiffs lacked standing to pursue claims as to any funds that no named plaintiff

purchased.  The court held:

> [I]f a party, such as plaintiffs in this case, is not personally injured
> by the alleged action of a defendant then he is not entitled to come
> into court and litigate that action, regardless of whether the

> disposition of his case necessarily requires the same result as the
> case of another. As such, plaintiffs lack standing for claims
> relating to funds in which they did not personally invest.

*Id.* at 532.

Plaintiffs do not allege that the 2003, 2007 or 2008 shelf registration statements common to many of the offerings *themselves* contained any false or misleading statements. (Compl. ¶¶ 594-606.) Because the offerings pursuant to each shelf registration statement span a lengthy period of time, during which — as the Complaint acknowledges — market conditions and AIG's financial situation changed markedly, and AIG's disclosures similarly varied in response, it would make no sense to afford standing to an investor to sue on all offerings that happen to have been effected pursuant to the same shelf registration statement.

AIG effected offerings at issue in this lawsuit based on the June 2003 Shelf Registration Statement as early as October 2006 (*see, e.g.*, Ex. 16 (Prospectus Supplement No. G-1, 5.60% Medium-Term Notes, Series G, dated October 13, 2006)) and as late as July 2007 (*see, e.g.*, Ex. 17 (Prospectus Supplement, AIG-FP-24, dated July 10, 2007)). AIG sold securities based on the June 2007 Shelf Registration Statement as early as July 2007 (*see, e.g.*, Ex. 18 (Prospectus Supplement, AIG FP-25, dated July 19, 2007), and over eight months later (*see, e.g.*, Ex. 19 (Prospectus Supplement, AIG-FP-57A, dated March 3, 2008)).

The Complaint itself makes clear that AIG's disclosures changed significantly over the course of the March 2006 through September 2008 proposed Class Period and alleges that various different misrepresentations and omissions infected the issuer's securities filings at different times. (*See, e.g.*, Compl. ¶ 594(a) (acknowledging that 2007 Second Quarter Form 10-Q provided relevant disclosure).) Moreover, the Complaint recognizes — as it must — that the proposed Class Period witnessed significant changes in the markets in which AIG operated. (*See, e.g.*, Compl. ¶ 16 (noting massive decline in housing and mortgage market).)

34

In consequence, a plaintiff who invested in 5.60% Medium-Term Notes in October 2006 relied on a different set of disclosure documents — and made his investment decision under a markedly different set of market conditions — than did an investor who purchased Medium-Term Notes issued in July 2007. Yet *both* offerings were based on the same June 2003 Shelf Registration Statement. On the facts of this case it would be especially inappropriate to grant standing to an investor in one offering to sue on behalf of a class of investors in other offerings.[37]

---

[37] Regardless of how the Court resolves the standing question, the Section 12(a)(2) claim with respect to the eighty-nine offerings for which there is no named plaintiff purchaser must be dismissed for failure to plead an essential element of a claim under this statutory section. *See Caiafa* v. *Sea Containers Ltd.*, 525 F. Supp. 398, 407-08 (S.D.N.Y. 2007) (dismissing Section 12(a)(2) claim where complaint did not allege that plaintiffs purchased shares in a public offering); *In re Cosi*, 379 F. Supp. 2d at 589 (holding that a plaintiff asserting Section 12(a)(2) claims must allege facts sufficient to demonstrate that it purchased securities directly in the public offering at issue).

The Court should also dismiss plaintiffs' Section 12(a)(2) claim because plaintiffs have failed to plead a "buyer-seller" relationship with any Underwriter Defendant, that is, that each plaintiff purchased securities directly from the underwriter it seeks to sue. Indeed, the Complaint does not identify the underwriter from which *any* plaintiff purchased any securities in the offering. This omission is fatal to the Section 12(a)(2) claim because Section 12(a)(2) "contemplates a buyer seller relationship not unlike traditional contractual privity." *Cortec Indus. Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991); *Pinter* v. *Dahl*, 486 U.S. 622, 642 (1988); *In re Harmonic, Inc.*, *Sec. Litig.*, No. C 00-2287, 2006 WL 3591148, *9-12 (N.D. Cal. Dec. 11, 2006) (dismissing Section 12(a)(2) claim because plaintiff failed to allege buyer-seller relationship). In any event, no plaintiff can recover under Section 12(a)(2) against any Underwriter Defendant from whom that plaintiff did not purchase.

## IV.

## <u>CERTAIN CLAIMS ARE TIME-BARRED</u>

Pursuant to Section 13 of the Securities Act, plaintiffs are required to have filed their Section 11 and Section 12 claims within one year after they discovered, or should have discovered through reasonable diligence, the alleged misstatements or omissions.   15 U.S.C. § 77m; *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 439-40 (S.D.N.Y. 2003).

First, plaintiffs were on actual notice of many of their claims (and inquiry notice of all of them) by no later than February 2008.   Consequently, claims against the fifteen underwriters who were not named as defendants in these consolidated actions until May 2009 are time-barred.   And because several offerings were not made the subject of any complaint until the same May 2009 Complaint, Securities Act claims as to those offerings are also untimely.

On February 11, 2008, AIG filed a Form 8-K with the SEC, which in plaintiffs' own words, acknowledged that "its credit default swap portfolio losses were understated and that material information previously supplied to the market . . . required correction," (Compl. ¶ 352) and that its auditor, PwC, had determined that there was a "material weakness" in AIG's internal control over financial reporting. (Compl. ¶ 357.)   AIG's Form 8-K on that date also disclosed other facts, described in more detail in AIG's brief, which plaintiffs also assert had previously been misstated or omitted.   (AIG Br. 62-65.)   Additionally, the Complaint alleges that, in response to the February 11, 2008 8-K, the major ratings agencies revised their outlook on AIG to negative.  (Compl. ¶ 370.)

These disclosures put plaintiffs on actual notice of their claims.  "The reasonable investor cannot blink away what the market sees." *In re Zyprexa Prods. Liab. Litig.*, 549

36

F. Supp. 2d 496, 540 (E.D.N.Y. 2003); *see Am. High-Income Trust* v. *Allied Signal,* 329 F. Supp.

2d 534, 550 (S.D.N.Y. 2004) (Swain, J.) (disclosure in Forms 10-K and 10-Q of financial

charges taken by issuer put plaintiffs on notice); *Lenz* v. *Associated Inns & Rests. Co. of Am.*,

833 F. Supp. 362, 375 (S.D.N.Y. 1993) ("[C]lear evidence that an investment asset has declined

in value or has been subject to an artificially inflated estimate of its value, in direct contradiction

of representation made to the plaintiff . . . [is] inquiry notice.").

Plaintiffs were also, by their own admission, on actual notice of additional claims

no later than the end of February 2008 by virtue of the disclosures in AIG's 2007 Form 10-K,

filed February 28, 2008. (*See, e.g.*, Compl. ¶¶ 594(b) (AIG disclosed the concentration of its

securities lending investments in RMBS in 2007 Form 10-K); 594(e) (AIG failed to disclose

until 2007 Form 10-K its concentration of credit risk in U.S. housing and mortgage market); 461

(internal control weaknesses revealed in 2007 Form10-K).) The same Form 10-K put investors

on notice of numerous other facts, discussed in detail in AIG's brief, which plaintiffs also claim

had been previously omitted or misstated (Compl. ¶¶ 359-377).[38]

None of the complaints in this action prior to the filing of the Consolidated

Amended Class Action Complaint on May 19, 2009 asserted any claims at all with respect to

several of the offerings now at issue: the October 13, 2006 5.60% Medium-Term Notes Series G;

the October 13, 2006 5.375% Medium-Term Notes Series MP; the October 13, 2006 Floating

Rate Medium-Term Notes Series MP; the Series A-2 Junior Subordinated Debentures; and the

Series A-3 Junior Subordinated Debentures. The claims as to these offerings — which are not

differentiated by plaintiffs from the claims related to other AIG securities offerings — were first

---

[38]   Indeed, plaintiffs were on notice of the facts giving rise to these claims by the time of the
Second Quarter 2007 Form 10-Q. *See* PWC Br. 35.

asserted long *after* the statute of limitations applicable to Section 11 and 12 claims had already run.  All of the Section 11 and 12 claims as to these offerings must therefore be dismissed as untimely.

Similarly, fifteen underwriters who participated in those same offerings were not sued prior to the May 19, 2009 version of the Complaint.[39]  Because these underwriters were not sued until after the applicable statute of limitations had run, the Complaint must be dismissed as to them.

Second, the allegations of the Complaint themselves establish that plaintiffs were on actual notice of one of their claims more than one year before the first complaint against the Underwriter Defendants was filed on October 9, 2008.  Specifically, plaintiffs allege that AIG "failed to disclose, until the Second Quarter 2007 10-Q, the decision to stop writing CDS contracts on multi-sector CDOs . . . ."  (Compl. ¶ 594(a).)

By plaintiffs' own admission, then, as of August 8, 2007 — when the Second Quarter 2007 Form 10-Q was filed — plaintiffs had actual knowledge that no prior SEC filing incorporated by reference into all of AIG's prospectuses had disclosed this alleged material fact. If — as plaintiffs now contend — this material omission gave rise to a cause of action under the Securities Act for every class member who purchased prior to the date of the disclosure on

---

[39]  These Underwriters are: ABN AMRO Bank N.V, Banca IMI S.p.A., Barclays Bank PLC, BNP Paribas Bank, Calyon, Citigroup Global Markets Limited, Credit Suisse Securities (Europe) Limited, Deutsche Bank AG, London Branch, HSBC Bank plc, Incapital LLC, JP Morgan Securities Ltd., Morgan Stanley Inc., The Royal Bank of Canada Europe Limited, The Royal Bank of Scotland and Société Générale.

Plaintiffs incorrectly identify UBS Securities LLC as one of the underwriters who participated in the 5.75% Series A-2 Junior Subordinated Debentures.  (See Compl. ¶ 591 (identifying UBS Securities LLC as a co-manager of the Series A-2 offering).)  UBS Securities LLC is not identified in the offering documents as an underwriter for this offering.

August 8, 2007, then the one year statute of limitations applicable to that claim expired three months *before* the first Securities Act suit was filed against the Underwriter Defendants in October 2008.   *In re Authentidate Holding Corp. Sec. Litig.*, 2006 WL 2034644, at *3 ("disclosures in Defendants' public filing" were sufficient to put plaintiffs on notice of alleged non-disclosure).

**V.**

**PLAINTIFFS FAIL TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED AS TO THE 5.60% MEDIUM-TERM NOTES BECAUSE THE ONLY NAMED PLAINTIFF WHO PURCHASED THOSE NOTES SOLD AT A PROFIT**

As reflected in Exhibit 1 to the Complaint, the only purchaser of 5.60% Medium-Term Notes, the State of Michigan Retirement Systems, sold them at a profit of $9550.  Plaintiffs cannot pursue a claim under Sections 11 or 12 if such a claim can result in "no conceivable damages."  *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 347 (S.D.N.Y. 2003) (dismissing Section 11 claims because plaintiffs suffered no loss).  Where, as here, the only named plaintiff has sold securities at a profit, any claim based on transactions in those securities must be dismissed.  *Id.*; *see also In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203-05 (9th Cir. 2002) (granting motion to dismiss Section 11 and Section 12 claims where pleadings revealed plaintiff had made a profit).

## CONCLUSION

For the foregoing reasons, the Underwriter Defendants' motion to dismiss should be granted and the Complaint against them dismissed in its entirely, with prejudice.

Dated:  New York, New York
        August 5, 2009

                                        Respectfully submitted,

                                        _____
                                        Richard A. Rosen
                                        Brad S. Karp
                                        PAUL, WEISS, RIFKIND, WHARTON
                                          & GARRISON LLP
                                        1285 Avenue of the Americas
                                        New York, New York 10019-6064
                                        Telephone: (212) 373-3000
                                        Fax: (212) 757-3990
                                        rrosen@paulweiss.com
                                        bkarp@paulweiss.com

                                        Charles E.  Davidow
                                        PAUL, WEISS, RIFKIND, WHARTON
                                          & GARRISON LLP
                                        2001 K Street, NW
                                        Washington, DC 20006-1047
                                        Telephone: (202) 223-7300
                                        Fax: (202) 223-7420
                                        cdavidow@paulweiss.com

                                        *Attorneys for Underwriter Defendants*